**Paul Richard COLELLA, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 71541.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 11, 1995.

Abel C. Limas, Brownsville, for appellant.

John A. Olson, Assistant District Attorney, Brownsville, Robert A. Huttash, State's Atty., Austin, for the State.

## OPINION

MEYERS, Judge.

In September of 1992, appellant was convicted of capital murder for murdering more than one person in the same criminal transaction. Tex.Penal Code Ann. § 19.03(a)(6)(A). After the jury affirmatively answered the submitted special issues, the trial court sentenced appellant to death. Tex.Code Crim.Proc.Ann. art. 37.071.[1] Appeal to this court is automatic. Art. 37.071 § 2(h). We will affirm.

In his first point of error, appellant contends that the evidence at his trial was insufficient to corroborate the testimony of the accomplice witness, Anthony "Red" Wilson.[2] He argues that the non-accomplice evidence is not sufficient to connect him to the crime. *See* art. 38.14. We disagree.

Viewed in the light most favorable to the verdict, the evidence at trial established the following: Rick Taylor, David Taylor, and Michael Lavesphere arrived at South Padre Island in a white pick-up truck on the afternoon of September 12, 1991. While driving along the beach, they encountered a vehicle stuck in the sand. The three attempted unsuccessfully to help the occupants of the vehicle free the car.

Shortly thereafter, appellant, his wife, Brenda Bowling, his sister, Lori, and Red drove up in Red's Ford Bronco. Red, being experienced in towing cars out of the sand, offered to free the car for a fee. Rick, David, and Michael remained to watch the action. After Red successfully freed the car, Rick, David, and Michael asked Red, appellant, Brenda, and Lori if they would like to "party" together. The group declined, but Red testified that they told the men where they would probably be later if they would like to join them. Red, appellant, and Lori then went to drop Brenda off so she could get ready to go to work.

Between 5:00 and 6:00 that evening, Rick, David, and Michael met up with appellant and Red on the beach.[3] The group drank alcohol and smoked marijuana. Brenda arrived later, having apparently been laid off

---

1. Unless otherwise indicated, all references to articles are to those in the Texas Code of Criminal Procedure.

2. An accomplice witness is a discredited witness whose testimony, without corroboration, will not support a conviction. *Walker v. State,* 615 S.W.2d 728, 731 (Tex.Crim.App.1981). Both appellant and the State concede Red is an accomplice to the crime. Further, the trial court instructed the jury on accomplice-witness testimony. *See* point of error two, *infra.*

3. Lori did not stay to "party."

from work, and joined in the "partying." Red and Rick played Frisbee by the water while the others remained by the vehicles. At one point, either David or Michael began throwing sand on Brenda. She asked him to stop and chased after him. Appellant told him, "Hey, that's my old lady. Why don't you leave her alone." He apologized to appellant saying that he did not know Brenda was married.

Brenda eventually left the party after arguing with appellant about his drinking. Red testified that she had asked him to stop appellant from drinking any whiskey because "[appellant] beats [her] whenever he gets mad or gets drunk." However, Red refused to intervene. Shortly thereafter, the party broke up. Appellant and Red went to "look for a tow." [4] Rick, David, and Michael left to dine in town.

On their way to dinner at about 8:00 p.m., Rick, David, and Michael happened upon Brenda who was hitchhiking along the side of the highway. They offered her a ride and she accepted. Rick testified that after about five to ten minutes Brenda became hysterical for some unknown reason and attempted to jump from their truck. Rick restrained her until the truck slowed down enough for her to get out without being injured. Rick denied that they raped Brenda. He further testified that she appeared uninjured when she left and that her clothes were not torn. The trio then drove on into town.

Sometime between 8:30 and 10:00 p.m., Brenda arrived at the trailer of Albin "Jack" Dunn. She was screaming hysterically and her clothes were wet and torn. She claimed that she had been raped by the guys in the white pick-up truck, but did not want to call the police because there was a warrant out for her arrest in Indiana.[5] Victoria "Vikki" Larsen, who was living with Jack, got in her van and went to look for appellant.

Meanwhile, after driving around and stopping at a convenience store, appellant and

Red decided to stop and bathe at some public showers along the beach. Afterwards, one or both of them stole a blue bag and a brown leather case from a boat at a nearby dock. The case contained a revolver and ammunition. Red and appellant then decided to go target shooting farther down the beach. After shooting for awhile, they got back into Red's truck and began driving back up the road.

After locating Red and appellant out on the highway, Vikki informed them that Brenda had been raped. Red and appellant immediately left for Jack's trailer. Appellant put the revolver in the waistband of his pants.

Upon arrival at Jack's trailer, appellant was visibly upset. Vikki testified that appellant was "extremely agitated, like going crazy." Appellant testified that when he saw Brenda he said "something to the effect that [he] wanted to go catch the sons-of-a-bitches and kill them." Sherie Wilson, Jack's neighbor, came over to the trailer.

Sherie, in an intoxicated state, began harassing Brenda. She said things like, "You can't rape the willing." A fight then broke out between Sherie, Brenda, and appellant. Sherie slapped appellant and Brenda went after her. Red finally got Sherie to get back into her truck, but she got out again. Appellant testified that "she started to come back at me. So I grabbed her and threw her on the ground." Sherie then went to get her husband, Sid.

Sid testified that his intention upon arriving at the trailer was to hit appellant because appellant had hit his wife. However, appellant pulled the revolver on Sid before Sid could strike him. Appellant then began to run away and Sid chased him. Appellant fired two shots. He testified that he did not aim at Sid and that he fired just to scare him. Sid continued to chase him. When appellant

4. Red and appellant would earn money by finding people who had gotten their vehicles stuck in the sand along the beach and then offer to tow them out for a fee.

5. Appellant and Brenda were both from Terre Haute, Indiana, and had only recently moved to the Island.

fell in the sand, Sid rushed at him and appellant fired again. This time Sid backed off and appellant ran into the dunes. Red and Brenda eventually picked appellant up and they went back to their campsite.

After a near discovery by Sid at the campsite, appellant, Brenda, and Red decided to leave. Brenda and appellant packed up their belongings and placed them in Red's Bronco. As they travelled north along the beach, they came across the white truck with the men that allegedly raped Brenda. They drove past the truck; then appellant told Red to turn around and go back. Red testified that appellant said, "Well, I'm going to get the son a bitches. I can't let them get away with this."

Appellant asked Brenda one more time if these were the men who raped her. She said yes. Red testified that appellant then jumped out of the Bronco, went over to the truck, shot one victim in the back of the truck, and then ran around to the driver's side to shoot the other victim who was in the truck's cab. Appellant, Red, and Brenda left, but appellant told Red that they needed to go back to move the truck so that it would not be found. Red complied.

Appellant got into the truck with the victims and drove north down the highway. Red and Brenda followed. Appellant eventually put the truck in the water on the bay side of the island and returned to Red's Bronco. At some point, appellant threw the gun in the ocean. Red then drove appellant and Brenda to appellant's mother's home in Port Isabel. Red testified that when he left them, appellant had a billfold containing several dollar bills of unknown denominations. Red had never seen appellant with a billfold before.

Appellant borrowed money from his parents for bus tickets and they drove him and Brenda to the bus station in Victoria, Texas. They purchased their tickets at 6 a.m. on September 13th and boarded the bus for Terre Haute, Indiana.

The bodies of David Taylor and Michael Lavesphere and the partially submerged white truck were discovered the morning of the 13th. Luis Martinez, Cameron County Sheriff's Office Criminal Investigator, estimated that the pair was killed at approximately 2 a.m. that morning and that the type of bullet used could have been fired from a revolver. Dr. Lawrence Dahm, a pathologist, testified that both victims had been shot at close range. Taylor had been shot once in the head and Lavesphere had been shot twice, once in the face and once in the neck. The murder weapon was never recovered.

Rick Taylor testified that he, David, and Lavesphere parked on the beach and settled down to sleep at approximately midnight. David took the cab of the truck and Lavesphere took the bed of the truck. Because there was no room left for Rick, he went to sleep in the dunes so that he would not be run over by any passing vehicles. That was the last he saw of his brother and Lavesphere. He further testified both David and Lavesphere had substantial amounts of money in their possession prior to their deaths. Little money was found on the victims upon their discovery.

■ Turning now to appellant's contention, we observe that article 38.14 provides:

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

To determine whether an accomplice's testimony is corroborated, we eliminate the accomplice testimony and review the remaining evidence to determine whether it tends to connect appellant to the offense. *Munoz v. State*, 853 S.W.2d 558, 559 (Tex.Crim.App. 1993). Further, we have stated:

> Corroborative evidence need not establish appellant's guilt of the charged offense nor directly link appellant to the offense, but is sufficient if it "tends to connect" appellant to the offense. Each case must be considered on its own facts and circumstances—

on its own merit. Apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.

*Id.* (citations omitted).

■ Viewed in the light most favorable to the verdict, the non-accomplice evidence in the instant case established that: (1) appellant knew the victims because he had "partied" with them earlier that afternoon; (2) during the party, appellant warned one of the men to leave his wife alone; (3) Brenda later claimed that these very men are the ones that raped her; (4) appellant became enraged; (5) appellant had a revolver in his possession; (6) appellant stated that he "wanted to go catch the sons-of-a-bitches and kill them;" (7) Red, the accomplice, gave Brenda and appellant a ride to his mother's home; (8) appellant had the opportunity to kill the victims because if they were killed at approximately 2 a.m., he still had time to kill them and arrive in Victoria by 6:00 a.m. (approximately a four-hour trip); (9) appellant and Brenda fled the island and the State.

In the instant case, the non-accomplice testimony places appellant in the company of the accomplice witness. It further tends to show he had a desire to kill the men, he had possession of a weapon of the type used in the murders, he had the opportunity to commit the murders,[6] and he fled the State shortly thereafter.[7] After eliminating all the accomplice testimony from the record, we determine the other facts and circumstances in evidence tend to connect appellant to the offense and corroborate Red's testimony. *See Richardson v. State,* 879 S.W.2d 874, 880 (Tex.Crim.App.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 741, 130 L.Ed.2d 643 (1995). Point of error one is overruled.

■ Appellant in his second point of error challenges the trial court's failure at punishment to submit the second special issue regarding parties to the jury. *See* Article 37.071 § 2(b)(2).[8] He avers that the jury convicted him as a co-defendant under the law of parties. Therefore, he argues that submitting the "anti-parties" issue was a mandatory requirement under Article 37.071, even though he made no request at trial to have the issue submitted.

The pertinent portions of the jury charge provide:

**3.**

Now, bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about the 12th day of September, 1991, in Cameron County, Texas, as alleged in the indictment,[9] the defendant, Paul Richard

---

**6.** An accused's opportunity to commit the offense may be a suspicious circumstance. *Gill v. State,* 873 S.W.2d 45, 49 (Tex.Crim.App.1994).

**7.** We have repeatedly held that flight is evidence of a circumstance from which an inference of guilt may be drawn. *Foster v. State,* 779 S.W.2d 845, 859 (Tex.Crim.App.1989), *cert. denied,* 494 U.S. 1039, 110 S.Ct. 1505, 108 L.Ed.2d 639 (1990).

**8.** Article 37.071 § 2(b)(2) provides:

[I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

**9.** Further, the indictment was read to the jury as follows without objection:

"In the name and by the authority of the State of Texas, the grand jurors for the County of Cameron, State aforesaid, duly organized as such at the January term, A.D.1992, of the 107th Judicial District, in and for said County, upon their oaths in said Court, present that Paul Richard Colella, hereinafter called the defendant, on or about the 12th day of September A.D. One Thousand Nine Hundred Ninety-one, and anterior to the present of this indictment, in the County of Cameron and State of Texas, did then and there unlawfully intentionally and knowingly cause the death of Michael Lavesphere by shooting said Michael Lavesphere with a firearm, and during the same criminal transaction the defendant did then and there intentionally and knowingly cause the death of David Ray Taylor, by shooting said David Ray Taylor with a firearm ... against

Colella, did then and there intentionally or knowingly murder more than one person during the same criminal transaction, to wit: that the said Paul Richard Colella did then and there intentionally or knowingly cause the death of the individuals, Michael Lavesphere and David Ray Taylor, by shooting the said Michael Lavesphere and David Ray Taylor with a firearm, and that the defendant, Paul Richard Colella, in so acting, was not acting under the immediate influence of sudden passion arising from an adequate cause, and that the said Paul Richard Colella did then and there intentionally or knowingly cause the death of the individuals, Michael Lavesphere and David Ray Taylor, by shooting them with a firearm, and that the defendant in so acting was not acting under the immediate influence of sudden passion arising from an adequate cause, then you will find the defendant guilty of capital murder and so say by your verdict.

\* \* \* \* \* \*

### 9.

You are instructed that an "accomplice" as the term is here used, means anyone connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime by unlawful act or omission on their part transpiring either before or during the time of the commission of the offense, and whether or not they were present and participated in the commission of the crime. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible or by both. Mere presence alone, however, will not constitute one a party to an offense.

The witness, Anthony R. Wilson, is an accomplice, if an offense was committed, and you cannot convict the defendant upon his testimony unless you first believe that his testimony is true and show that the defendant is guilty as charged, and then you cannot convict the defendant upon said testimony unless you further believe that there is other testimony in the case, outside of the evidence of the said Anthony R. Wilson tending to connect the defendant with the offense committed, if you find that an offense was committed, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission, and then from all of the evidence you must believe beyond a reasonable doubt that the defendant is guilty of the offense charged against him.

[Footnote added.]

It would seem that appellant contends paragraph 9 of the charge is a "parties charge." Appellant is mistaken. In the context of the charge as a whole, paragraph 9 is merely an "accomplice-witness" charge explaining to the jury how it should weigh the testimony of Anthony Wilson. It is clear from paragraph 3 that appellant was charged as the primary actor in the offense and not under the law of parties as appellant argues.

We further note that the evidence does not show nor did the State argue during closing that anyone other than appellant is guilty of the murders in the instant case. The trial court did not err in failing to give the "anti-parties" charge at punishment. Point of error two is overruled.

In point of error three, appellant asserts that the trial court improperly granted the State's challenges for cause for venire-members Bristol, Vermaas, Esparza, and Baughman in violation of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). He claims that because the venirepersons each demonstrated that they could follow the statutory scheme under Article 37.071, they were not challengeable merely because they opposed the death penalty.

---

the peace and dignity of the State," signed by the form [sic] of the grand jury.

Although appellant's, Brenda Bowling's and Anthony Wilson's names all appear on the actual indictment, no parties language is ever used. Additionally, appellant did not request a parties charge at the guilt/innocence phase of the trial.

■ Article 37.071 was revised by the Texas Legislature in 1991 and applies to all offenses occurring on or after September 1, 1991. *See* Tex.S.B. 880, Sec. 5, 72nd Leg., R.S. (1991) V.T.S.L.S. Chapter 838. The instant offense occurred on September 14, 1991. Therefore, the statutory scheme utilized in the charge at punishment stated:

### SPECIAL ISSUE NO. 1

Is there a probability that the defendant, Paul Richard Colella, would commit criminal acts of violence that would constitute a continuing threat to society?

\* \* \* \* \* \*

### SPECIAL ISSUE NO. 2

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, is there a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

*See* Article 37.071 § 2(b)(1) & (e).

Under *Wainwright v. Witt,* a venireperson's views on capital punishment support exclusion for cause only when they are such that they would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d 841; *see also Vuong v. State,* 830 S.W.2d 929, 942 (Tex.Crim.App.), *cert. denied,* 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992); *Moody v. State,* 827 S.W.2d 875, 888 (Tex.Crim.App.), *cert. denied,* 506 U.S. 839, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). Under the former version of Article 37.071 [10] a veniremember's acknowledgment that his attitude toward the death penalty would "affect" his deliberations was not sufficient to sustain a challenge for cause. *Adams v. Texas,* 448 U.S. 38, 49–50, 100 S.Ct. 2521, 2528–2529, 65 L.Ed.2d 581 (1980); *Riley v. State,* 889 S.W.2d 290, 300 (Tex.Crim.App., op. on reh'g, Dec. 21, 1994). Rather, the dispositive question was whether the venireperson could give honest answers to questions of fact, even if it meant that the death penalty might be assessed as a result. *Id.*

Under our new statutory scheme, however, jurors are called upon not only to answer factual questions but also to decide whether there are mitigating circumstances, including the "personal moral culpability" of the defendant, that would justify imposition of life imprisonment instead of death as an appropriate punishment. Because this task involves the exercise of moral discretion distinct from the determination of objective facts, we held in *Staley v. State,* 887 S.W.2d 885 (Tex.Crim.App.1994) that potential submission to the jury of an issue substantially the same as that submitted pursuant to statute in the instant cause [11] meant that prospective jurors might lawfully be excluded for their unwillingness to impose the death penalty under any circumstances, even if

---

**10.** The former version of Article 37.071 (now codified at Article 37.0711) which is applicable to offenses occurring before September 1, 1991, provided for the following special issues:

 (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

 (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

 (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Under this version of the statute, the jury was not required to consider what sentence a defendant would receive. The jury's only duty was to answer these abstract questions.

**11.** The fourth special issue in *Staley* provided:

 Do you find from the evidence beyond a reasonable doubt, after considering all mitigating evidence, if any thereby, and considering the defendant's level of culpability, character and background and the circumstances of the offense, that the penalty of death is the appropriate punishment?

they were not first asked whether they could honestly answer the questions of fact also submitted for their consideration.

In *Staley,* the trial court actually instructed the jury to answer an additional, or fourth, special issue, not then authorized by statute. In that case, veniremember Chandler responded that she did not "believe death is appropriate" and "that feeling would cause her to answer [the fourth special issue] 'no'." *Id.* Chandler had previously stated that she would base her answers to the special issues on the evidence. This Court held:

> Today, we are presented with a juror who, under our former caselaw and absent the fourth special issue, arguably would not have been challengeable for cause. For while Chandler was opposed to the death penalty she may have been able to follow the law. See *Adams,* supra; *Riley,* supra. However, as for the fourth special issue, Chandler stated in no uncertain terms that she believed morally that death was not appropriate and she would answer that question in the negative. Recently the Supreme Court stated that jurors "whether they be unalterably in favor of or opposed to the death penalty in every case—by definition are ones who cannot perform their duties in accordance with the law, their protestations notwithstanding." *Morgan v. Illinois,* 504 U.S. 719, 735, 112 S.Ct. 2222, 2233, 119 L.Ed.2d 492 (1992).

*Id.* at 894. Chandler was such a juror because she would *always* answer the fourth special issue to support a life sentence. Our holding in *Staley* applies equally to the new version of Article 37.071.

■ In the instant case, venireperson Bristol, like Chandler, emphasized his disagreement with the death penalty:

PROSECUTOR: Let's say we've done that. Now we are in the guilty phase—I'm sorry, the punishment phase. And this jury has to determine punishment. And you are, let's say, for example, one of these jurors. And you listen to the evidence, and you know, you say, "Well, you know

even though I feel that person under the law deserves it, I have problems inside with it. I have reservations whether I can kill this." Would you have reservations?

A. Yes.

\*　　\*　　\*　　\*　　\*　　\*

Q. Do you feel that your feelings would affect you in making the decision?

A. Yeah.

Q. Yes? Do you feel that all the evidence may show but that you could not kill them?

A. I wouldn't be—give it, kill another human being.

Q. .... So you do not feel that you could give it?

A. (Shaking head.)

Q. Okay. And it didn't matter the circumstances, it's just something personal?

A. Yeah.

Although during his voir dire as a whole Bristol seemed to state that he could follow the statutory scheme, his answers were nevertheless sufficient to support a rational conclusion by the trial judge that he would automatically find mitigating circumstances to justify avoiding assessment of a death sentence, regardless of the evidence adduced at trial. *Hernandez v. State,* 757 S.W.2d 744, 753 (Tex.Crim.App.1988). Therefore, the trial court did not abuse its discretion in granting the State's challenge for cause.

■ The remaining three venirepersons, Vermaas, Baughman, and Esparza, each emphatically stressed that they would never answer the second special issue to give a death sentence under any circumstance. Any potential juror who states that he or she will automatically vote against the death penalty without regard to the evidence is announcing an intention not to follow the instructions to consider the evidence and to decide if it is insufficient to preclude the death penalty. *See Morgan v. Illinois,* 504 U.S. at 736–738, 112 S.Ct. at 2234, 119 L.Ed.2d 492. Therefore, again, the trial

court did not abuse its discretion in granting the State's challenges for cause. *See Barnes v. State,* 876 S.W.2d 316, 325 (Tex.Crim. App.), *cert. denied,* —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). Point of error three is overruled.

In appellant's fourth point of error, he claims that the trial court erred by denying his challenges for cause against venire-members Moreno, Reyes, and Torres. After his challenges for cause were denied, appellant peremptorily struck each of them.

 When a trial court errs in denying a challenge for cause, the defendant is harmed only if he uses a peremptory strike and, thereafter, suffers a detriment from the loss of that strike. *Demouchette v. State,* 731 S.W.2d 75, 83 (Tex.Crim.App.1986), *cert. denied,* 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). In order to preserve error, appellant must: (1) use all of his peremptory strikes; (2) ask for and be refused additional peremptory strikes; and (3) be forced to take an identified objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause or granted him additional peremptory strikes. *Id.*

In the instant case, appellant used only ten of his fifteen allotted peremptory strikes. *See* Article 35.15(a). Therefore, even if the trial court erred in denying the challenges for cause, appellant can not show that he suffered the loss of any strikes nor that he was harmed. *Demouchette,* 731 S.W.2d at 83. Point of error four is overruled.

In his fifth point of error, appellant asserts that the evidence was insufficient for the jury to make an affirmative finding that he would be a "continuing threat to society." Article 37.071 § 2(b)(1) (special issue number one). He also argues that his mitigating circum-

stances were sufficient to warrant a sentence of life imprisonment as opposed to death. *See* Article 37.071 § 2(e). We will address the sufficiency of the "continuing threat" evidence first.

 In reviewing the sufficiency of the evidence at the punishment phase, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt. *See Stoker v. State,* 788 S.W.2d 1, 7 (Tex.Crim.App.1989), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). The burden was on the State to prove the punishment issues beyond a reasonable doubt. Article 37.071 § 2(c).

 A jury is permitted to consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[12] *See Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Crim.App.1987). The jury is entitled to consider all the evidence presented at the guilt/innocence phase of the trial, in addition to the evidence presented at the punishment phase. *Valdez v. State,* 776 S.W.2d 162, 166–67 (Tex.Crim.App.1989), *cert. denied,* 495 U.S. 963, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990).

 In some instances the circumstances of the offense and the events surrounding it may be sufficient to sustain a "yes" answer to the first special issue. *See Vuong v. State,* 830 S.W.2d 929, 935 (Tex.Crim.App.), *cert. denied,* 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992); *Stoker,* 788 S.W.2d at 7. We have also held that it is not necessary for the State to buttress its case on future dangerousness with psychiatric testimony. *Narvaiz v. State,* 840 S.W.2d 415, 425 (Tex.Crim. App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The jury is the exclusive judge of the credibility of

---

12. Among those factors are: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *Keeton,* 724 S.W.2d at 61.

witnesses and the weight to be given their testimony. *Barnes*, 876 S.W.2d at 321; *Lafoon v. State*, 543 S.W.2d 617, 620 (Tex.Crim. App.1976).

The evidence in the instant case revealed that appellant murdered two men with a revolver at point-blank range while they slept. Earlier, appellant had expressed a desire to kill the men because they had allegedly raped his wife. Additionally, a considerable amount of money had been taken from his victims and appellant tried to hide the bodies by driving the victims' truck into the water. The evidence also showed that appellant had stolen the gun that same day and felt free to fire it at Sid, his "friend," during an argument. Sid was not armed. Further, appellant threw Sherie to the ground because she had slapped him and was insulting him and Brenda. Although we hesitate to conclude that this evidence alone would support a finding of future dangerousness, the State presented more.

At the punishment phase of trial, the State introduced the following evidence: (1) in the summer of 1982, appellant was charged with child molestation which was later reduced to battery; (2) in December 1982, appellant confessed to burglary of a building, but he was not charged as part of a plea bargain; (3) in 1984, appellant was charged with false information for creating a false bomb scare; (4) appellant was then placed in the Jabalt School for Boys, an Indiana institution for delinquent minors, but was released because "he was not taking advantage" of the programs the school offered; (5) Monte Tosser, a Jabalt School counselor, testified that appellant had behavioral problems at the school including "physical altercations with peers;" (6) in December 1985, at the age of sixteen, appellant was convicted for burglarizing the

residence of an 83 year-old woman; (7) knives from appellant's home were found at the scene of the burglary; (8) appellant was sentenced as an adult to eight years for the burglary, but was paroled in 1990; (9) during his arraignment for the instant crime, appellant acted hostile toward a camera man and had to be restrained; (10) Officers Douglas Brentzinger and Joseph Newport of the Terre Haute Police Department[13] each gave his opinion that he believed appellant would be a continuing threat to society because appellant was a "career criminal" and his crimes had gotten progressively worse; and (11) Monte Tosser also testified that he believed appellant would be a continuing threat to society.

We conclude there was sufficient evidence to support the jury's affirmative finding that there was a probability that appellant would be a continuing threat to society.

Appellant also maintains that his mitigating evidence was sufficient to outweigh any other factors and warrant life imprisonment as opposed to death.[14] This Court has previously held:

> In Texas, this mitigating evidence is admissible at the punishment phase of a capital murder trial. Once admitted, the jury may then give it weight, if in their individual minds it is appropriate, when answering the questions which determine sentence. However, "[t]he amount of weight that the factfinder might give any particular piece of mitigating evidence is left to 'the range of judgment and discretion' exercised by each juror."

*Banda v. State*, 890 S.W.2d 42, 54 (Tex.Crim. App.1994); *Johnson v. State*, 773 S.W.2d 322, 324 (Tex.Crim.App.1989), *affirmed in part*, *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct.

---

**13.** Officer Brentzinger and Newport were investigating officers for the 1985 burglary and were each familiar with appellant's record.

**14.** Appellant's mitigating circumstances included: (1) appellant was diagnosed as hyperactive at the age of four; (2) he attended special classes for the "emotionally disturbed"; (3) he attempted to hang himself when he was eight-years old

and was admitted to a mental hospital for one month; (4) he was in therapy for a period of time; (5) his former employer, David Coffee, testified that the appellant was a good employee; (6) appellant told Coffee a few weeks before the murders that he was going to move "back North;" and (7) David Taylor's mother didn't hate appellant for killing her son.

2658, 125 L.Ed.2d 290 (1993). No burden of proof exists for either the State or the defendant to disprove or prove the mitigating evidence. *Barnes,* 876 S.W.2d at 330.

Unlike a particular offense or defense defined in the Texas Penal Code which contains specific elements that must be met, "mitigating evidence" is not specifically defined. Instead it is left to each individual juror's own determination. In fact, Article 37.071 § 2(f)(4) defines "mitigating evidence" to be "evidence that a juror *might* regard as reducing the defendant's moral blameworthiness." (Emphasis provided). There is no *per se* evidence that must be viewed by a juror as creating a mitigating effect.

Because the weighing of "mitigating evidence" is a subjective determination undertaken by each individual juror, we decline to review the evidence for sufficiency. We defer to the jury's conclusion that the evidence was not sufficient to warrant a sentence of life imprisonment. Appellant's fifth point of error is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

CLINTON, Judge, dissenting.

I dissent to the Court's disposition of appellant's point of error number three insofar as it holds the trial court did not err to grant the State's challenge for cause against venireman William Bristol. I am the first to acknowledge that a venireman who indicates he will always, invariably answer the special issue set out in current Article 37.071, § 2(e), V.A.C.C.P., in such a way as to prevent imposition of the death penalty is subject to a challenge for cause on the ground that he harbors a bias against a phase of the law upon which the State is entitled to rely, under Article 35.16(b)(3), V.A.C.C.P. See *Riley v. State,* 889 S.W.2d 290, 301, n. 4 (Tex.Cr.App.1993). Had Bristol given any indication during his voir dire that he would be such a juror, I would agree with the Court that the record was "sufficient to support a

rational conclusion by the trial judge that he would automatically find mitigating circumstances to justify avoiding assessment of a death sentence, regardless of the evidence adduced at trial." Op. at 842. But he did not. He did not come close. I therefore dissent.

I also write separately to add to the Court's analysis of that part of appellant's fifth point of error that claims, essentially, that the jury's negative answer to the Article 37.071, § 2(e) issue was against the greater weight and preponderance of the evidence, and that we should therefore reform his sentence to life imprisonment. Because appellant provides no briefing whatsoever for this sub-contention, the Court would do better not to address it at all. See Tex.R.App.Pro., Rule 74(f). Because the Court does anyway, I write further to address that as well.

*I.*

The offense in this cause was committed after the 1991 amendment to Article 37.071, V.A.C.C.P. See Acts 1991, 72nd Leg., ch. 838, § 1, p. 2899, eff. Sept. 1, 1991. Under Article 37.071, § 2(e), as it currently reads, the jury at the punishment phase of a capital murder trial is instructed to answer whether mitigating evidence is sufficient to warrant imposing a life sentence rather than the death penalty. We recognized in *Riley* that:

"it is arguable that categorical opposition to the death penalty can support a trial court's conclusion that a venireman is 'substantially impaired' under *Wainwright v. Witt,* [469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)], at least if that opposition would cause the venireman invariably to answer the special issue required to be submitted by subsection [2](e) in such a way as to prevent imposition of the death penalty. *Cf. Staley v. State,* 887 S.W.2d 885 (Tex.Cr.App.1994) (venireman who maintained his categorical opposition to death penalty would cause him invariably to answer jury nullification instruction in satisfaction of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256

(1989), in such a way as to prohibit imposition of death sentence was properly subject to State's challenge for cause.)"

*Id.,* at 301, n. 4. We made it clear in *Staley* that the trial court did not violate the Sixth Amendment by granting a State's challenge for cause against a venireman who indicated he would always answer the Eighth Amendment special issue in such a way as to block imposition of the death penalty. 887 S.W.2d at 894. Even in this context, however, mere opposition to the death penalty, even categorical opposition, does not alone suffice to justify granting the State's challenge for cause. The State must establish further that the venireman's opposition to capital punishment would cause him invariably to answer the Eighth Amendment issue (or, as in this case, the Article 37.071, § 2(e) special issue) in such a way as to insure that the sentence of death would not be imposed. See *Riley,* supra, at 301, n. 4.

All of Bristol's testimony that supposedly supports the conclusion he would automatically answer the § 2(e) special issue so as to avoid the death penalty is set out in the majority opinion. It is true enough that Bristol had some nebulous "reservations" about the death penalty; that he could not "kill another human being[;]" that he "[did] not feel that [he] could give it[.]" None of these answers remotely establishes that he would automatically answer the § 2(e) special issue affirmatively. The prosecutor did not even explain the operation of the special issues to him, much less inquire whether his apparent inability personally to impose a death penalty would cause him consciously to distort his response to one of them.

A venireman must be told what the law requires of him before it can be said that he cannot follow it. *Cuevas v. State,* 742 S.W.2d 331, 343, n. 12 (Tex.Cr.App.1987). That the venireman harbors some attitude antithetical to the law is of no moment so long as he can lay that attitude aside and abide by the requirements of the law. The proponent of a challenge for cause has the burden of establishing his challenge is proper. *Hernandez*

*v. State,* 757 S.W.2d 744, 753 (Tex.Cr.App. 1988) (plurality opinion). The proponent does not meet that burden until he has shown that the venireman understood the requirement of the law and could not overcome his prejudice well enough to follow it. We have applied this eminently sensible principle often enough when it was a capital defendant making the challenge for cause against a venireman who held in low regard some aspect of the law upon which the defendant was entitled to rely. E.g., *Cuevas v. State,* supra; *Trevino v. State,* 815 S.W.2d 592, 614, (Tex.Cr.App.1991); *Teague v. State,* 864 S.W.2d 505, 513 (Tex.Cr.App.1993). *Cf. Martinez v. State,* 899 S.W.2d 655 (Tex.Cr. App., Dec. 14, 1994) (defendant's challenge for cause appropriately denied where, even though venireman opined in response to inartful questioning that he would not be able to follow court's instruction not to apply law of parties at punishment phase of trial, counsel's questions were "confusing and were not followed up by more pinpoint questioning" regarding his ability to follow the law). It is beyond my comprehension why the State is not required to explain the obligations of the law with equal clarity before this Court is willing to say the State has met its burden to show a venireman cannot follow it. In the case of venireman Bristol, the State did not explain the obligations of the law at all. Thus, it has failed to meet its burden to show that Bristol was challengeable for cause because biased against a phase of the law upon which it was entitled to rely. See Article 35.16(b)(3), supra.

Inexplicably, the majority also relies upon a part of the colloquy between Bristol and counsel for appellant. Op. at 842. In context of the whole colloquy it is clear that appellant was *not* attempting to ascertain whether Bristol would *always* answer the special issue in such a way as to avoid the death penalty. Rather, he was inquiring whether there might be *any* set of mitigating circumstances sufficient to answer the § 2(e) special issue "yes," so that Bristol could *ever* vote against imposition of the death penalty. This does not address any aspect of the law

upon which the State was entitled to rely. Not even the State's so-called interest in insuring that a capital defendant receives a fair and impartial trial is called into play here, since Bristol apparently acknowledged that there were circumstances in which he could envision answering the special issue affirmatively. See *Nethery v. State,* 692 S.W.2d 686, 691 (Tex.Cr.App.1985); *Phillips v. State,* 701 S.W.2d 875, 884–85 (Tex.Cr.App. 1985). This portion of Bristol's voir dire does not support the grant of the challenge for cause against him at all.

The trial court abused its discretion in granting the State's challenge for cause against Bristol. We should at least vacate the death sentence and remand the cause for a new punishment hearing, under Article 44.29(c), V.A.C.C.P., if not for a whole new trial. See *Ransom v. State,* [1994 WL 259057] (Tex.Cr.App., No. 71,633, delivered June 15, 1994) (pending State's motion for rehearing) (Slip op. at 5, n. 5). The Court errs not to.

## II.

Appellant nakedly contends that the mitigating evidence was so compelling that we should reform his sentence to life imprisonment. Whether this is a "sufficiency" review appellant thus requests, as the majority characterizes it, Op. at 844, or a claim that the verdict is against the great weight and preponderance of the evidence, depends upon who carries the burden of proof under Article 37.071, § 2(e), supra. We have yet to resolve this question.

We came closest in *Barnes v. State,* 876 S.W.2d 316 (Tex.Cr.App.1994), where we commented on the question in passing. Barnes had argued that the trial court erred not to instruct the jury at the punishment phase of his capital murder trial that the State had a burden to negate evidence proffered in mitigation of the death penalty. This Court held that the trial court had not erred because neither the Eighth Amendment, nor any state provision implementing it, had assigned such a burden to the State. In a footnote we remarked:

"Currently, Article 37.071 mandates that a jury that finds beyond a reasonable doubt, as required by Subsection (c), that the special issues under Subsection (b) should be answered affirmatively must go on pursuant to Subsection (e) to decide whether mitigating circumstances nevertheless warrant a life sentence. However, neither Subsection (c) nor Subsection (e) itself expressly assigns a particular burden of proof on the issue of mitigation. It might be argued, although we certainly have no occasion here to hold, that Subsection (c) implicitly assigns the burden to the beneficiary of a finding of 'sufficient mitigating ... circumstances to warrant that a sentence of life ... be imposed.' Cf. *Arnold v. State,* 786 S.W.2d 295, at 298 (Tex. Cr.App.1990) (State has burden of proof to establish harmless error under Tex. R.App.P. 81(b)(2), as beneficiary of the error). That, of course, would be the defendant."

*Id.,* at 330, n. 17.

I agree with the *Barnes* footnote that Article 37.071, § 2(e) assigns at least a burden of *production* to the defendant. Before a capital jury can even reach the § 2(e) issue, it must have affirmatively found the existence of aggravating facts under Article 37.071, § 2(b), for which the State expressly shoulders the burden of proof, under § 2(c). Once these facts have been established to the jury's satisfaction to a level of confidence beyond a reasonable doubt, the jury proceeds to the § 2(e) special issue, *viz:* "whether ... there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment *rather than a death sentence* be imposed." (Emphasis added.) If there are *not* sufficient mitigating circumstances, the default position is that a sentence of death will be imposed. This means that it is the capital defendant who stands to benefit from the presentation of mitigating evidence.

Because appellant is, thus, the beneficiary of mitigating evidence, the burden of production falls to him. *Arnold v. State,* supra.

Therefore, if the jury verdict is against him, appellant can only argue on appeal that the verdict was against the greater weight and preponderance of the evidence. Cf. *Meraz v. State,* 785 S.W.2d 146, 155 (Tex.Cr.App.1990) (defendant has burden to prove affirmative defense of insanity, and appellate review of a verdict against him inquires whether verdict was against the great weight and preponderance of the evidence); *Bigby v. State,* 892 S.W.2d 864, at 875 (Tex.Cr.App.1994) (same). Strictly speaking, the majority errs to characterize appellant's contention as a claim that the evidence is not "sufficient."

In any event the majority is correct that we *cannot* review the claim on appeal, however we characterize it. Subsection 2(f)(4) of Article 37.071 defines as mitigating anything "that a *juror* might regard as reducing the defendant's moral blameworthiness." (Emphasis added.) Thus the statute assigns exclusively to the jury the task of evaluating what evidence proffered in mitigation of the death penalty is sufficient and what is not. We cannot say that evidence was mitigating as a matter of law any more than we can say, in a non-capital case, that the evidence is insufficient to support a twenty year sentence, or that the greater weight and preponderance of the evidence establishes that the proper sentence would have been ten years, probated. There is simply no way for an appellate court to review the jury's normative judgment "that the evidence was not sufficient to warrant a sentence of life imprisonment." Op. at 844. Though it should not have reached this sub-contention in appellant's fifth point of error, the majority correctly disposes of it on the merits.

Because the Court fails to hold that the trial court erred to excuse venireman Bristol for cause, I respectfully dissent.

OVERSTREET, J., joins.

1. There are three witnesses in this case with the last name "Wilson": the accomplice witness, Anthony "Red" Wilson; Sherie Wilson; and, Sid Wilson. I will refer to the accomplice as "Red"; Sherie Wilson as "Sherie"; and, Sid Wilson as "Sid."

BAIRD, Judge, dissenting.

Tex.Code Crim.Proc.Ann. art. 38.14 provides that a conviction cannot be had upon the testimony of an accomplice "unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." My review of the instant record reveals the non-accomplice evidence establishes only the commission of an offense; there is no evidence tending to connect appellant with its commission. Accordingly, I dissent to the disposition of the first point of error.

Initially, it should be noted that the majority opinion fails to separate the accomplice and non-accomplice evidence. This is contrary to the long standing rule of this Court that, to determine whether the accomplice testimony is corroborated, we must eliminate the accomplice witness testimony from the record and determine whether the other inculpatory facts and circumstances in evidence tend to connect appellant to the offense. *Munoz v. State,* 853 S.W.2d 558, 559 (Tex.Cr.App.1993), and cases cited therein. Consequently, I will set forth the evidence in the proper framework.

## I. THE ACCOMPLICE EVIDENCE

Anthony "Red" Wilson testified he was previously convicted of burglary, two thefts, two possessions of marihuana and twice for driving while intoxicated.[1] Although Red was indicted for the instant capital murder, his testimony was secured as a result of an agreement with the State whereby he would receive absolute immunity provided he did not actually kill the victims.[2]

Red lived in his Ford Bronco on the beach at South Padre Island, earning money as a mechanic and towing vehicles which became

2. In his initial written statement, Red omitted any information regarding his participation in the instant offense or the possible locations of any evidence. Only after appellant was arrested did Red provide information concerning his participation.

stuck in the sand. He met appellant and Brenda, appellant's wife, four or five months before the murders. Appellant often helped Red hook up the tow rope for a portion of the tow fee.[3] The night before the murders Red stayed on the beach with appellant's sister, Lori. Before noon Red and Lori were joined by appellant and Brenda. After lunch they came upon Ricky Taylor and the victims attempting to pull a vehicle from the sand.[4] When Taylor's efforts proved unsuccessful, Red and appellant were hired to tow the vehicle. After doing so, the group sat around and talked. Red told them where the people on the beach "partied" and stated he would meet them later. Red, appellant, and Lori left to drink, smoke marihuana, and look for more people to tow. They dropped Brenda off at Jack Dunn's trailer to get ready for work and met Taylor and the victims on the beach later. The group smoked more marihuana, drank, and listened to music.

Brenda arrived an hour later. Shortly thereafter, appellant's brother, Steve Watts, stopped by and picked up Lori. When one of the victims started "messing" with Brenda, she became angry and appellant told the victim to leave Brenda alone because she was his "old lady." The victim responded: "Hey, I am sorry. I didn't know she was married." Red further stated that Brenda approached and asked Red to keep appellant from drinking any hard liquor because appellant beat Brenda when he got drunk. When Red refused, Brenda left. Red and appellant also left to look for another tow.

Red stated he and appellant went to the store and then to a public shower. While Red showered appellant stayed outside with the Bronco. When Red returned to the Bronco, appellant was coming from the boat docks area. When appellant got into the Bronco he stated he hit the jackpot showing Red a revolver, a tote bag with bullets and

pills, and a camera. They drove to the beach and inspected the items; both men fired the weapon at some beer cans.

Shortly thereafter Red saw the flashing headlights of Vicki Larsen's van. When Larsen told them Brenda had been raped, Red and appellant went to Dunn's trailer. After they arrived and talked to Brenda, appellant wanted to kill the men who raped her. Red told appellant he was not going to take him anywhere while he had the gun. Red believed they could not call the police because there was an arrest warrant for Brenda from Indiana.

Sherie Wilson arrived and did not believe Brenda was raped. Sherie said things such as: "You can't rape the willing." Appellant told Sherie to shut up and Sherie slapped appellant. At this point Brenda and Sherie began to fight. Red put Sherie in her vehicle and put it in gear to make her leave. She stopped and began to cuss. Appellant grabbed Sherie's hair and pulled her from her vehicle. Sherie returned to her vehicle and left.

Sherie returned with her husband, Sid Wilson. As Sid approached appellant, appellant stepped backward. Sid began to chase appellant and Red heard several gun shots. When Sid returned he asked Dunn to drive him to the police station to tell them about appellant. Dunn refused. Appellant returned, Sid chased him again and Red heard more gun shots. Red and Brenda got into the Bronco and left to find appellant and Sid. After locating them, Red drove Sid back to Dunn's trailer while Brenda stayed with appellant. Red returned to appellant and Brenda, and all three returned to their campsite.

When they later heard Sid driving around, Red and Brenda left in the Bronco while appellant stayed at the campsite.[5] After fif-

---

**3.** Red's average fee for a tow was $20.00 to $30.00 and he averaged three or four tows a day.

**4.** It is my policy to not refer to crime victims by name unless necessary to understand the facts or the law.

**5.** On cross-examination Red testified that he heard one "pop" which he thought was Sid shooting at appellant with a rifle. Red stated: "I believe it was Sid letting [appellant] know he had a gun, too."

teen minutes they returned and appellant told them Sid had returned with a rifle. The three decided it would be safer if the campsite was relocated. They gathered their tent and left in the Bronco.

As Red, appellant and Brenda drove down the beach they saw the victims' pickup. Red stated they should get the police but appellant and Brenda stated they could not go to the police. They drove closer to the pickup and saw no movement. After passing the pickup, appellant told Red to turn around. When Red asked why, appellant said "[d]on't worry about it." Appellant then stated "I'm going to get the sons of bitches. I can't let them get away with this."

Appellant told Red to turn on his lights and ran to the back of the pickup and fired into the bed.[6] Appellant then went to the *driver's side* of the pickup and fired into the open door.[7] Appellant returned and jumped in the back of the Bronco. Red drove away. Shortly thereafter appellant told Red to turn around and they drove past the victims' pickup. Appellant told him to stop and appellant stated he needed to get rid of the pickup. Appellant got out of the Bronco and told Red to follow him. Red and Brenda began driving down the beach and appellant passed them in the victims' pickup.

Red and Brenda followed and came upon the pickup. Appellant came over and stated he was stuck in the sand and wanted Red to pull him out. Red positioned the Bronco to pull the pickup from the sand. Red told appellant he did not want to pull the pickup out and appellant stated "[d]on't worry about it. I'll take the rap." Red went to the pickup to show appellant how to engage the

four wheel drive. One victim was laying across the seat and appellant moved him so Red could get to the lever. When Red was unable to engage the four wheel drive, they hooked up the tow rope to pull the pickup from the sand. However, they were unable to do so because the drive shaft on the Bronco broke.

As Red began to work on his Bronco, appellant was able to engage the four wheel drive on the victims' pickup. Appellant drove away in the pickup. Later he returned wet and on foot as Red completed repairing his drive shaft. As they drove away appellant was going through a wallet, pulling out several bills. He took an "ID" from the wallet and threw it out the window. They stopped and appellant threw the gun into the ocean. They drove to the campsite where appellant and Brenda retrieved their belongings. Red then drove them to a pay phone at the edge of town near the Tiki Restaurant. Appellant and Brenda got out and appellant asked for Red's shirt.[8] Appellant then warned Red that if he went to the police he would regret it.

The next morning appellant's brother, Steve Watts, awoke Red saying he wanted to make sure Red was alright. Watts stated that appellant arrived the night before with a lot of money and wanted to leave town. Watts was worried that appellant had killed Red and taken his money. When Red left with Watts to go get coffee, they saw the pickup in the bay. Watts then dropped Red off at the Bronco. Red drove to Sid's and borrowed a broom to clean the Bronco. Red gave Sid a bullet he found laying on his floorboard as a "token for [Sid] to keep."[9]

Sid and Red left to tow a vehicle. As they were towing the vehicle, Ricky Taylor drove

**6.** On cross-examination Red testified at one point that he never saw appellant reload the gun that day and he later testified appellant reloaded after they shot at the beer cans.

**7.** On cross-examination Red admitted his testimony at another trial estimated the murders occurred sometime between 9:30 p.m. and 12:00 midnight. However, in the instant case Red testified he "never knew what time it was."

**8.** On cross-examination Red testified that appellant already had a shirt on and that he did not

know why appellant asked for a shirt. On redirect examination Red testified appellant asked for his shirt because it had long sleeves.

**9.** On cross-examination Red denied knowing the bullet was a nine millimeter bullet. Red testified that he told Sid, "I don't know if this is the size of it or not, but here." Sid told him it was a nine millimeter.

up and asked if anyone had seen the victims. Red told Taylor he had not. Sid told Taylor that Brenda had accused him and the victims of rape. Taylor stated: "[w]e didn't rape nobody. I don't know what you're talking about." Red later threw away the tote bag and sold the camera.

Several months later Red talked with appellant in the Cameron County Jail. When Red asked appellant how they found him in Indiana, appellant stated he and Brenda had a fight and Brenda was living with another man. When appellant came to get Brenda, she told the other man she had to go with appellant because he was wanted in Texas for killing some guys; she did not want appellant to hurt the other man.

## II. THE NON–ACCOMPLICE EVIDENCE

### A. The Physical Evidence

#### i. Boyd

On September 12, 1991, Detective Boyd of the South Padre Island Police Department was dispatched to the murder scene. Upon arrival, Boyd observed a white pickup truck partially submerged in the bay of South Padre Island. Boyd waded to the pickup and observed two victims, one in the bed of the pickup and one in the front seat. Boyd observed a pair of cowboy boots on the shore and tire tracks that appeared to have been made by another vehicle which pushed the

pickup into the bay. However, Boyd made no attempt to search the pickup for fingerprints, secure the boots or to preserve the tire tracks as evidence.[10]

#### ii. Martinez

Detective Martinez of the Cameron County Sheriff's Office was the lead investigator. Martinez secured the scene and discovered blood stains in the sand as well as tire tracks which appeared to have been made by another vehicle which pushed the pickup into the bay. Martinez did not recover the boots on the shore and took no action to preserve the bloodstains or tire tracks as evidence.[11] Additionally, Martinez did not attempt to locate any fingerprints on the pickup or the items within the pickup, but did interview the victims' friends and the persons who lived on the beach.[12] At the time of trial Martinez had investigated several hundred murder cases and, in his opinion, the murders occurred at approximately 2:00 a.m. or 3:00 a.m., September 12, 1991.

#### iii. Batsell

Gordon Batsell testified he worked at Batsell's Sporting Goods in Brownsville and was trained in ammunition and weapons. Two handgun manufacturers marketed three different nine millimeter revolvers, the latest manufactured in 1985. Nine millimeter revolvers are not popular and are considered rare. Batsell examined a bullet recovered from one of the victims. In his opinion,

---

**10.** Appellant called the Municipal Judge at South Padre Island, Brian Hunsaker, to testify concerning Boyd's investigative techniques. Hunsaker was called to the scene at approximately 12:00 noon and stated he observed Boyd open the door to the truck, get in and attempt to turn the steering wheel. Further, after talking to Boyd and Detective Martinez, Hunsaker indicated on his report that the victims had been dead approximately six hours.

**11.** Robert De La Paz, a retired U.S. Marshal and an investigator for appellant, testified that, in the past, he had made plaster cast impressions of tire tracks in conditions similar to South Padre Island.

**12.** Appellant called Detective Merlin Roscoe of the Brownsville Police Department to testify con-

cerning proper investigation of murder scenes. Roscoe was shown pictures of the instant murder scene and the various vehicles and tire tracks within the scene. Roscoe testified such scenes must be secured and only police investigators should be allowed within the secured area. The scenes must be photographed and then a thorough search for evidence conducted. Everything which has any possible evidentiary weight should be retrieved and, if possible, fingerprinted. If something is wet at the time you encounter it, it can be fingerprinted after it has dried. When asked by the prosecutor if he could have investigated this case better, Roscoe replied, "absolutely."

based on its diameter and weight, it was consistent with a nine millimeter bullet.[13] However, Batsell testified that without further testing he could not distinguish the bullet from .357, a .380 or a .38 because the difference in the diameters of these bullets is less than two one-thousandths of an inch.

#### iv. Dahm

Dr. Lawrence Dahm performed autopsies on the victims and determined they died as a result of gun shot wounds at close range. The bullet and wounds suggested a medium caliber weapon such as a nine millimeter. The wounds and the position in which the victim's were found suggested both were shot from the *passenger side* of the pickup. Further, photographs of the victims at the murder scene indicated the bodies were in rigor mortis which normally develops within two hours of death, and is fully developed approximately six hours after death. Rigor Mortis will remain for eight to twelve hours. Dahm could not state when rigor mortis developed in the victims.

#### v. Marchan

Joe Marchan, supervisor of the Department of Public Safety Crime Laboratory in McAllen, who often retrieved crime scene evidence, testified: 1) it is within the officer's discretion whether to retain evidence at a crime scene; 2) blood spots in the sand are difficult to analyze; and, 3) it is more beneficial and far easier to take photographs of tire tracks rather than make a plaster cast impression. However, the photographs taken in the instant case were not beneficial.

**13.** Appellant called Sergeant Alfredo Petrarca who was assigned to the training division of the Brownsville Police Department and is the department's firearms instructor and armorer. He inspected the bullet recovered from the autopsy and that bullet, in his opinion, was a nine millimeter hollow point bullet. This was different from the bullet Red gave to Sid, which was a full metal jacketed bullet.

**14.** Delora Waldroff testified that she sent a check to Taylor and his brother on September 5, 1991.

#### vi. Taylor

Ricky Taylor testified he was the brother of one of the victims. Taylor, his brother, and the other victim worked for B & W Enterprises, a seismic exploration company. Taylor and his brother were paid on September 5, 1991, but the remaining victim was not paid until later and should have had a large amount of money with him at the time of the murders.[14]

The seismic crew's work was rained out so Taylor and the victims went to South Padre Island for the weekend. While driving on the beach, they encountered another vehicle which was stuck in the sand and attempted to remove it. A Bronco with two males and two females arrived. One of the males was appellant who asked Taylor how much he was charging to pull the vehicle from the sand and Taylor stated they were just getting some beer. When Taylor was unable to free the vehicle, appellant and Red freed the vehicle. The group then talked for a while and agreed to meet later on the beach.

Taylor and the victims were on the beach drinking vodka and orange juice, as well as beer, when they again saw appellant, Red and Lori. Later, Lori left and Brenda arrived. They played frisbee and talked for about two hours. Taylor and the victims left to change clothes and get something to eat. As they drove toward town they picked up Brenda. However, after approximately five or ten minutes Brenda became hysterical, began screaming and wanted out of the pickup. As they stopped, Brenda jumped from the pickup. At that time, according to Taylor, Brenda's clothes were not torn and she

The other victim was not paid at this time; instead the company later cashed a check and forwarded the cash to him.

Jerry Ramirez, custodian of evidence officer for the Cameron County Sheriff's office, testified that Taylor's brother had $249.11 when he was found and the other victim had no money. During his inventory of the truck, Ramirez found $20.68 and an additional $8.00 in a shaving kit.

was not scratched.[15] Taylor and the victims ate in town and returned to the beach. They stopped about 11:30 p.m. and the victims slept in the pickup. Taylor slept in a sleeping bag in some sand dunes about 50 feet away. When he awoke the next morning the pickup and victims were gone.

Taylor began walking to town and was picked up by some co-workers also visiting South Padre Island. As they were looking for the victims, Taylor encountered Red and Sid. Red seemed quiet and said little. Taylor asked if they had seen the victims and they stated they had not. However, Sid told him Brenda returned the night before stating she had been raped by "three guys in a white pickup." Taylor denied he or the victims raped Brenda. Sid also told Taylor there were some police cars and an ambulance up the beach. Taylor and the co-workers drove up the beach and found the pickup in the bay.

### vii. Watts

Appellant's brother, Steve Watts, testified he went to South Padre Island regularly to check on appellant. The day after the murders he went to look for appellant and found Red. He asked Red if he had seen appellant and Red stated he had not. Red told him Brenda was raped the night before and that appellant had fought with Sid. Watts' continued search for appellant was unsuccessful.

### viii. Pflaum

Amy Pflaum testified that on September 12, 1991, she worked for Greyhound Trailways in Victoria. She remembered that, at 6:00 a.m., on a Friday in mid September, 1991, appellant and Brenda purchased tickets to Indiana. Appellant stated he had just traveled from Brownsville to Victoria. Brownsville is 232 miles from Victoria and, in Pflaum's experience, it would take at least four and one-half hours to make that drive.

### B. The Beach Witnesses [16]

Jack Dunn testified that he lived in a trailer with Vicki Larsen near the beach. Dunn met appellant approximately six weeks before the murders when appellant and Brenda moved to the beach. Red had lived on the beach for approximately two years. Most of the people who lived on the beach earned money by towing vehicles which were stuck in the sand. Brenda worked at the Pizza Hut in South Padre Island.

Appellant and Red dropped Brenda at Dunn's trailer so she could shower and change clothes for work. Appellant and Red returned to the beach to look for a tow and Larsen drove Brenda to town. After dark that evening a car stopped outside Dunn's trailer and Dunn heard Brenda scream. Brenda was scratched and her clothes were torn. She stated she, appellant and Red were socializing with Taylor and the victims when she and appellant got into an argument. Brenda left the group and appellant and Red left to look for a tow. Brenda saw the three men some time later and they informed her appellant had asked them to take her to appellant. Brenda told Dunn and Larsen she got into the pickup but the men took her elsewhere. She stated two of the men held her down while one raped her. Brenda would not call the police because she was "wanted" in Indiana. Brenda was hysterical and, in Dunn's opinion, had been raped.

Dunn and Larsen unsuccessfully attempted to locate appellant and Red through a citizen's band (cb) radio. However, Sherie answered and came to Dunn's trailer. Sherie was intoxicated. Larsen asked Sherie to help Brenda get cleaned up and Larsen left to find appellant. Larsen found appellant and Red and followed them to Dunn's trailer. Upon seeing Brenda, appellant became very angry and pulled a pistol. Appellant stated: "There is no mother fucker going to rape my old lady. I'll kill the son of a bitch." Red

---

**15.** Taylor later heard that Brenda had seen the appellant before she became hysterical.

**16.** Because of the similarity in the testimony of Jack Dunn, Vicki Larsen, Sherie Wilson, and Sid Wilson, I have combined their testimony.

and Brenda tried to calm appellant. Sherie got into an argument with appellant after she stated "[h]ow can you rape the willing?" Then Sherie slapped appellant and Brenda yelled "[y]ou don't slap my husband." Sherie left, but returned with her husband, Sid, and the argument resumed. Sid began chasing appellant and appellant pulled a gun and shot twice. Sid stopped and returned to Dunn's trailer to pickup Sherie. While departing, Sid heard appellant yell something.

Later, Red knocked on Dunn's trailer and stated they (Red, Brenda and appellant) were going back to their campsite. Sid drove to the campsite but found no one there. Sid never saw appellant again, but Red brought over a bullet the next day. This bullet was turned over to the police.[17]

## C. Appellant's Testimony [18]

Appellant testified he moved from Indiana to Texas in September of 1990. Appellant was previously convicted twice of burglary, once as an adult and once as a juvenile. And, as a juvenile, he committed a criminal trespass and was sent to a boy's school.

In July 1991, appellant, Brenda and Lori moved to the beach on South Padre Island. Appellant met Red in late July. They became friends and together they towed vehicles from the sand. On the day before the murders, appellant and Brenda saw Red and Lori. They went to town, bought food and beer, and returned to the beach where they spent most of the day drinking and looking for a tow. Some time after lunch they came upon a pickup unsuccessfully attempting to pull a car from the sand. They waited to see if the people needed help. During this time they met Taylor and the victims. After the car was freed they took Brenda to Dunn's trailer so she could get ready for work. Appellant, Red, Lori and her son left to return to their campsite but stopped when they saw the pickup again. The group listened to

music and drank. Watts and Brenda arrived. Brenda stated she was told she did not have to work. Lori and her son left with Watts. Brenda and one of the victims began to throw sand at one another. Appellant said nothing until one of the victims "grabbed [Brenda's] butt." Appellant then stated "[h]ey, that's my lady," and the victim apologized. Shortly thereafter, Brenda got upset because appellant was drinking "hard liquor" (he was supposed to be going to Alcoholics Anonymous). Brenda left, as did appellant and Red.

Appellant and Red went into town and bought gas and drinking water. On the way back to the beach they stopped at the public showers. After both showered, Red asked appellant to be a look-out while Red entered the boat dock. Red returned carrying a blue tote bag and a brown leather case. There was an expensive camera, lenses and a tripod in the tote bag and a large silver revolver and bullets in the brown case. Red stated he could sell the gun and appellant wanted to split the money. They drove out to the beach and fired the revolver at a can, and then drove further stopping to shoot a sign. They got into the Bronco and put the revolver on the dash.

Appellant and Red stopped when they saw the flashing lights of Larsen's van and Larsen informed them that Brenda had been raped. As Red drove to Dunn's trailer, appellant picked up the revolver, put it in his waistband, and said, "[l]ets go." When appellant saw Brenda she was crying and hysterical. They could not notify the police of the rape because Brenda previously stole and cashed a welfare check in Indiana. Appellant became very upset and stated he wanted to "catch the sons-of-a-bitches and kill them." An argument began when Sherie called Brenda a liar and stated that you "can't be raped unwillingly." Sherie slapped appellant. Brenda and Sherie began to fight. Red put Sherie into her vehicle and when she

---

17. This is the same bullet mentioned in n. 9, *supra*.

18. Testimony elicited from a witness called by the accused and offered by the accused is not accomplice witness testimony. *Selman v. State*, 807 S.W.2d 310, 311 (Tex.Cr.App.1991).

got out again appellant grabbed her and pulled her to the ground. Red restrained Sherie and put her back into her vehicle.

Brenda was still crying when Sherie returned with Sid. Sid jumped from his vehicle yelling he was going to bash in appellant's head. When Sid came toward appellant, appellant backed away. Appellant pulled the revolver and shot in the air when Sid swung at appellant. Sid laughed and said appellant would have to do better than that. Appellant turned and ran. After being chased through the sand dunes appellant fell and Sid rushed at him. Appellant shot several more times to back Sid away. Appellant ran across the sand dunes. Sid yelled to appellant, "[y]ou can't get away from me that easy" and "I'll get you eventually anyway."

Sid began to walk back to his vehicle and appellant followed. Sid saw appellant and began chasing him. After some time Sid returned to his vehicle and drove away. When Red and Brenda picked up appellant, Brenda was still crying. Red stated "[g]ive me the damn gun because you ain't got the guts to use it," and appellant gave Red the revolver. There were no live shells in the gun at this time—all the shots had been fired while Sid was chasing appellant. They returned to their campsite.

At the campsite the three discussed what to do about Sid. They did not believe Sid would allow appellant to "get away with shooting at him." They heard Sid's vehicle and Red stated Sid was coming with the rifle. Red further stated he heard Sid shoot his rifle. Red and Brenda left in the Bronco, but appellant stayed to make sure Sid did not destroy the campsite. Appellant hid in the sand dunes and watched Sid drive up. Sid yelled, "[w]ake up you son-of-a-bitches, I'm back." Sid had a stick or a rifle and knocked down appellant's tent. Appellant waited until Sid left and then went to pick up the campsite. Red returned with Brenda, who was still upset and crying. Red informed appellant that Brenda told him (Red) about the rape. The three decided it was not safe to use the campsite that night and packed up some of their belongings. They further decided it would not be safe to stay on the beach because Sid was always around.

Because of their fear of Sid, appellant and Brenda decided to return to Indiana. Appellant asked Red to drive them to appellant's mother's home in Port Isabel. As they passed through town, a band at the Third Coast Country Club was still playing; therefore, appellant knew it was before midnight. When they arrived at his mother's home, they unloaded and Red left.

Appellant knocked on the door and asked his mother to come outside. He told her about the situation with Sid and asked her for enough money to take a bus to Indiana. His step-dad was going to Corpus Christi and appellant asked him to leave earlier so appellant and Brenda could catch a bus. When they got to Corpus Christi, the bus station was closed. They drove to the Victoria bus station, arriving at 5:00 or 5:30 a.m. The total trip took about five hours because there was a rain storm that night. As soon as the ticket booth opened, appellant purchased tickets to Indiana.

While appellant was in Indiana, his mother informed him that he and Brenda had warrants out for their arrest. Appellant stated he would stay away until they caught the person who committed the murders. Appellant did not want to be "railroaded" on this case because of his criminal history.

## III.

An accomplice witness is a discredited witness because her or his testimony alone cannot furnish the basis for the conviction. No matter how complete a case may be made out by an accomplice witness or witnesses, a conviction is not permitted unless he or they are corroborated.

*Walker v. State,* 615 S.W.2d 728, 731 (Tex.Cr. App.1981). All the facts and circumstances in evidence are looked at to determine whether non-accomplice evidence corroborates the accomplice testimony. *Mitchell v. State,* 650 S.W.2d 801, 807 (Tex.Cr.App.1983).

The non-accomplice evidence is sufficient if it tends to connect the defendant to the offense; this evidence need not establish guilt or even directly link the defendant to the offense. *Gosch v. State*, 829 S.W.2d 775, 777 (Tex.Cr.App.1991); *Cox v. State*, 830 S.W.2d 609 (Tex.Cr.App.1992); *Granger v. State*, 683 S.W.2d 387, 392 (Tex.Cr.App.1984); *and*, *Castaneda v. State*, 682 S.W.2d 535, 537 (Tex. Cr.App.1984). However, each case is determined on its own merit, *Mitchell v. State*, 650 S.W.2d at 807, and the non-accomplice evidence must point toward the defendant's *commission* of the offense. *Munoz*, 853 S.W.2d 558. Non-accomplice testimony which corroborates the accomplice testimony, but does not connect the defendant with the commission of the offense, is insufficient. *Id.*, 853 S.W.2d at 563–564. Thus, proof of suspicious circumstances will not satisfy the requisites of art. 38.14. *Id.; and, Windham v. State*, 479 S.W.2d 319, 321–322 (Tex.Cr. App.1972).

### A.

Under art. 38.14 the State was required to corroborate Red's testimony, that is, to produce independent evidence tending to connect appellant with the *commission* of the offense. However, in the instant case, the non-accomplice evidence corroborates only the events which occurred prior to the murders or establishes only the commission of the murders. There is no evidence tending to connect appellant with the commission of the murders.

The majority finds the following sufficient to tend to connect appellant with the commission of the offense:

1. appellant knew the victims because he had "partied" with them earlier that afternoon;

2. during the party, appellant warned one of the men to leave his wife alone;

3. Brenda later claimed that these very men were the ones that raped her;

4. appellant became enraged;

5. appellant had a revolver in his possession;

6. appellant stated that he "wanted to go catch the sons-of-bitches and kill them;"

7. Red, the accomplice, gave Brenda and appellant a ride to his mother's home;

8. appellant had the opportunity to kill the victims because if they were killed at approximately 2:00 a.m., he still had time to kill them and arrive in Victoria by 6:00 a.m. (approximately a four-hour trip); and,

9. appellant and Brenda fled the island and the State.

*Ante*, 915 S.W.2d at 839.

The first, second and third pieces of evidence only corroborate the events which occurred before the murders—they do not connect anyone with the *commission* of the offense.

The third, fourth and sixth pieces of evidence may establish a motive to harm the victims, but, unless there is evidence appellant acted on the motive, such does not tend to connect appellant with the offense. Evidence of motive alone is never sufficient to corroborate the testimony of an accomplice witness. *Leal v. State*, 782 S.W.2d 844, 852 (Tex.Cr.App.1989) ("Evidence of motive, alone, cannot be sufficient to corroborate the testimony of an accomplice witness."). There is no non-accomplice evidence that appellant acted on the purported motive.

The fifth piece of evidence does not tend to connect appellant with the commission of the offense because there is no non-accomplice evidence to establish that the revolver in appellant's possession was the same weapon, or even of the same caliber, as the weapon used to murder the victims. The only examination of the bullet recovered at the autopsy revealed that it may have been a nine millimeter bullet. No murder weapon was ever recovered and the only suggestion that appellant's revolver was a nine-millimeter comes from the accomplice witness.

In its consideration of the seventh piece of evidence the majority actually expresses a

preference for appellant's testimony as opposed to that of the accomplice witness. Red testified he left appellant and Brenda at the Tiki Restaurant on the edge of South Padre Island; comparatively, appellant testified Red drove them to appellant's mother's home in Port Isabel. In either event this factor does not tend to connect appellant with the commission of the offense.

The majority's consideration of the eighth piece of evidence is puzzling. Because the pathologist did not approximate a time of death, the majority looks to a police officer to supply this important testimony. The non-accomplice evidence concerning the time of the murders came from Detective Martinez who opined the murders occurred around 2:00 or 3:00 a.m. And, even within the time frame established by Martinez, the majority assumes the murders must have been committed at 2:00 a.m. The majority's need to establish the time of the murders as early as possible becomes apparent when we consider Pflaum's testimony that appellant was in Victoria before 6:00 a.m. But the majority's time line is too close. The undisputed testimony established that it took approximately *four and one-half hours* to travel between Victoria and McAllen. And we know that South Padre Island is even further from Victoria. Accordingly, this evidence cannot tend to connect appellant to the offense. It is improbable that someone committed two murders on South Padre Island at 2:00 a.m.; broke camp; caught a ride to the city of South Padre Island; used a pay phone to call for a ride to Port Isabel; and, finally, arranged a ride to Victoria, arriving at the bus station before the ticket booth opened at 6:00 a.m.

The ninth piece of evidence is appellant's trip to Indiana. The majority is correct that flight may *serve* to corroborate accomplice testimony. *Cockrum v. State,* 758 S.W.2d 577, 582 (Tex.Cr.App.1988). However, appellant's trip to Indiana is not necessarily flight from the commission of the murders. *See, Moron v. State,* 779 S.W.2d 399, 403 (Tex.Cr. App.1985). The non-accomplice evidence established the altercation between appellant and Sid, and Sid's anger toward appellant. Such evidence indicates that appellant's trip to Indiana may not be flight following commission of the instant offense but, rather, flight from Sid. Consequently, one cannot conclude appellant's departure was indeed flight.

### B.

The majority's analysis is lacking and fails to cite any controlling authority in its resolution of this point of error. However, my research reveals a strikingly similar case. In *Cruz v. State,* 690 S.W.2d 246 (Tex.Cr.App. 1985), the State presented non-accomplice testimony proving: the defendant was near the scene of the crime with a pistol and rifle prior to the time the victim was shot; the defendant, his wife, and accomplice disappeared from the area at approximately the same time the victim was shot; a gift belonging to the victim was found in the defendant's vehicle; and the defendant was arrested in California. *Id.* at 248–250. We held the non-accomplice testimony did not tend to connect the defendant to the offense because the evidence only corroborated extraneous matters and the State never proved the significance of the location of the gift. *Id.* at 251.

In the instant case, appellant was seen with a revolver prior to the time the victims were shot. Appellant and Brenda left the area and were later arrested in Indiana. However, none of the victims' property was found with either appellant or Brenda. Consequently, the non-accomplice evidence in the case at bar is weaker than that in *Cruz.*

*Walker v. State,* 615 S.W.2d 728 (Tex.Cr. App.1981), is an accomplice witness case containing facts similar to those in the instant case as they relate to the murder weapon. In *Walker,* a policeman was murdered. Through the testimony of an accomplice, the State proved the accomplice and Walker were looking for guns to steal on the evening of the offense. The accomplice testified Walker stole a rifle and ammunition from a truck. Walker shot a street light and stated

that he could shoot the victim from the same distance with no problem. The accomplice testified that plans were made to kill the victim. The accomplice drove Walker to his car and left alone. While driving through town, the accomplice stopped and spoke briefly with the victim. Later, the accomplice drove down the street and saw the victim's leg sticking out of the car. The accomplice picked up Walker, who stated, "well, I did it." The accomplice and Walker drove to a lake where the accomplice threw the rifle into the lake. The police recovered two .22 caliber rifles from the lake. Walker's fingerprint was recovered in the pickup from which the rifle was stolen; however, expert testimony failed to positively identify the recovered rifle as the murder weapon. *Id.* at 729–731.

We held the evidence insufficient to corroborate the testimony of the accomplice witness. The position of the complainant's leg sticking out of the vehicle and the discovery of the rifle at the location provided by the accomplice did not tend to connect the defendant with the commission of the offense. Evidence which only corroborates the testimony of the accomplice, but does not tend to connect the defendant to the offense, is insufficient corroboration on which to base a conviction. *Id.*, at 732.[19]

Similarly, in the instant case, when considering only the non-accomplice evidence, there is ample evidence to establish the murders occurred at South Padre Island. And there is ample evidence that appellant possessed a revolver and had reason to be angry with the victims. However, there is *no* evidence which tends to connect appellant or the revolver with the commission of the murders. And motive is insufficient corroboration under art. 38.14. *Leal, supra. See also, Munoz,* 853 S.W.2d at 564 (Evidence which only casts suspicion upon the defendant is insufficient to meet the requirements of art. 38.14); *Adams v. State,* 685 S.W.2d 661, 668 (Tex.Cr. App.1985); *Gardner v. State,* 730 S.W.2d 675, 678–679 (Tex.Cr.App.1987); *and, Forbes v. State,* 513 S.W.2d 72, 75–76 (Tex.Cr.App. 1974).

Moreover, the instant case is especially disturbing because the non-accomplice evidence casts serious doubt on the reliability of the accomplice testimony. Red testified he saw appellant run to the rear of the pickup and shoot the first victim, and then run to the *driver's side* of the pickup to shoot the second victim. Dahm, the coroner, testified the victims were shot from the *passenger side* of the pickup. Red also testified that appellant alone disposed of the victims' pick-

---

**19.** In yet another accomplice witness case, *Castaneda v. State,* 682 S.W.2d 535 (Tex.Cr.App. 1984), we stated:

... Although the State's case contains a great amount of detailed corroborative evidence which shows the commission of the murders, there is no corroborative evidence which links [Castaneda] to the crime. The State argues that blood found on [Castaneda's] discarded clothing links [Castaneda] to the crime. We would note initially that the only testimony which identified these items of clothing as belonging to [Castaneda] is hearsay testimony from one of the investigating officers. The State's brief emphasizes that the yellow coat was found in "[Castaneda's] bedroom." However, the record does not bear this out. The officer's testimony only refers to "the bedroom of the home." The evidence showed that [Castaneda] lived in the house with his mother and brother and there is no testimony that shows who occupied "the bedroom." Secondly, there is no evidence in the record that [Castaneda] was wearing this clothing at the time of the murders. The State also argues that the

bloodstained knife connects [Castaneda] to the offense. However, the only evidence linking [Castaneda] to the knife came from the accomplice witness. No one else testified that the knife belonged to [Castaneda], or that [Castaneda] was ever seen in possession of the knife ... Finally, the State argues that the evidence shows that [Castaneda] and [the codefendant] admitted the killings in the presence of several other persons shortly after the offense. However, the only testimony concerning these admissions came from the accomplice witness. The State did not have any of the other persons who heard these admissions testify. Thus there is no corroboration. There is no evidence other than the testimony of the accomplice witness that places [Castaneda] and [co-defendant] at the pool hall at any time. The corroborative evidence produced by the State in no way connects [Castaneda] to the crime. Because of the lack of evidence in this regard, we find that the evidence is insufficient.

*Castaneda,* 682 S.W.2d at 538.

up. However, the physical evidence at the scene led the investigating officers to conclude the victims' pickup had been pushed into the bay by another vehicle. Appellant did not own a vehicle and Red controlled the Bronco which was appellant's only means of transportation.

The evidence in this record suggests that Red, not appellant committed the murders. A more likely scenario is the following: after dropping off appellant and Brenda, Red proceeded to the beach, committed the murders, pushed the pickup in the bay and disposed of the murder weapon. This scenario is consistent with the estimated time of death, the coroner's testimony and that of Amy Pflaum, the bus station attendant. Because this scenario is much more likely than the State's theory of prosecution, my confidence in jury's guilty verdict is undermined.

In conclusion, after a painstaking review of the entire record, I am convinced the non-accomplice evidence is insufficient to corroborate the accomplice witness testimony. I would reverse the judgment of the trial court and order an acquittal. Judge Learned Hand once wrote that "[o]ur procedure has always been haunted by the ghost of an innocent man convicted. It is an unreal dream." *United States v. Garsson*, 291 F. 646, 649 (S.D.N.Y.1923). I fear, in the instant case, that unreal dream is a reality. I respectfully dissent.[20]

OVERSTREET, J., joins this opinion.

---

**20.** As a final footnote, the reader may be interested to know that, in a separate trial where Red also testified in exchange for immunity, Brenda Colella was convicted of capital murder and sentenced to life imprisonment. The Corpus Christi Court of Appeals held the evidence insufficient, reversed the judgment of the trial court and ordered an acquittal. *Colella v. State*, 860 S.W.2d 618 (Tex.App.—Corpus Christi 1993).