

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

NO. AP-76,317

---

JERRY DUANE MARTIN, Appellant

v.

THE STATE OF TEXAS

---

ON DIRECT APPEAL
FROM CAUSE NO. 24,087 IN THE 278TH DISTRICT COURT
WALKER COUNTY

---

**MEYERS, J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, COCHRAN, and ALCALA, JJ., joined. KELLER, P.J., concurred.**

**O P I N I O N**

Appellant was convicted in December 2009 of capital murder. TEX. PENAL CODE §19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of

Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. Article 37.071 §2(g).[1] Direct appeal to this Court is automatic. Article 37.071 §2(h). After reviewing appellant's twenty points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

SUFFICIENCY OF THE EVIDENCE

Appellant was charged with capital murder, specifically, committing murder while escaping or attempting to escape from a penal institution. TEX. PENAL CODE §19.03(a)(4). Appellant challenges the sufficiency of the evidence at both phases of trial.

In reviewing a claim that evidence is legally insufficient to support a judgment, "the relevant question [on appeal] is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the fact finder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Therefore, in analyzing the legal sufficiency, we will determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence, both direct and circumstantial, when viewed in the light most favorable to the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

*Guilt Phase*

The evidence at trial established that on September 24, 2007, appellant was an inmate incarcerated for a felony offense at the Texas Department of Criminal Justice ("TDCJ") Wynne Unit located in Huntsville. He and fellow inmate John Falk were assigned to the same work squad that morning to hoe and aerate the onion patch. The Wynne Unit onion patch is outside the main perimeter fence of the prison and adjacent to the City of Huntsville Service Center ("Service Center"). The Service Center was, at that time, separated from prison property by only a chain-link fence in some portions and a barbed-wire fence in others.

Four squads had been turned out to work that day, each consisting of twenty inmates with a single armed guard on horseback. Each guard carried a .357 revolver with six bullets. An armed supervising sergeant accompanied the squads in the fields. Finally, a "high rider" also patrolled the squads. The high rider was another guard on horseback who patrolled outside the prison fence on Service Center property and acted as the "last line of defense" in the event of an escape attempt. The high rider carried a .357 revolver with six bullets and a .223 rifle with four rounds. The high rider that day was Officer Susan Canfield, an experienced rider and guard.

Appellant was part of squad number five, which was assigned to work in the portion of the onion field closest to the Service Center. Officer Joe Jeffcoat oversaw

appellant's squad. Falk was assigned to the row in their squad's section farthest from the fence, and appellant voluntarily took the row next to him. Jeffcoat testified that appellant and Falk were friends and that they usually worked together. He also noted that he had never had any problems with the pair before that day.

After the squads had been working for a while, appellant approached Jeffcoat asked him to hold his watch because it had broken. Jeffcoat agreed. When appellant got about 20 feet from him, Jeffcoat heard something to his left; he turned to see Falk walking towards him from the other side. When he turned back towards appellant, appellant was already at Jeffcoat's side reaching for his .357 revolver. Appellant and Jeffcoat began struggling over the gun, and Jeffcoat yelled for help. Falk then started shoving Jeffcoat out of his saddle. Appellant was able to get the gun as Jeffcoat came off his horse on top of him. Jeffcoat began to wrestle with appellant, but Falk came around and appellant tossed the gun to him. Jeffcoat let go of appellant and started after Falk, but Falk pointed the gun at him. At this time, Jeffcoat heard his superior, Field Sergeant Larry Grissom, yell to get down, so he did.

Appellant and Falk then fled through the barbed-wire fence and onto Service Center property. Grissom and the other guards focused on apprehending Falk because Falk had the gun. Appellant ran off in another direction. Grissom fired twice at Falk, but Falk ran behind some equipment. Guards from two of the other squads also fired shots at Falk but to no avail.

At this point, the high rider, Canfield, engaged in a gun fight with Falk.  Canfield advanced on Falk while firing at him with her revolver.  When Canfield expended her bullets, Falk ran at her as she was trying to remove her rifle from its scabbard.  The two engaged in a struggle for the weapon while Canfield attempted to turn her horse away from Falk.  However, once Falk jabbed his stolen revolver in her ribs, Canfield ceased struggling and Falk took the rifle.  Falk then backed away.

Meanwhile, during the gunfight, appellant ran to a truck parked outside the Service Center sign shop.  Larry Horstman of the City of Huntsville sign shop testified that the truck was a one-ton, flat-bed pick-up truck with toolboxes on the side.  He stated that he always parked the truck about 10 feet from the sign shop door and left the keys in it.  Jeffcoat testified that he saw the truck parked in the same spot every time he was working in the onion field.

Appellant got into the truck and sped straight towards Canfield.  Horstman testified that he heard his truck take off "real fast."  Other witnesses testified that the truck was "floorboarded," "going as fast as it could go," "being revved at high rpms," leaving acceleration marks as it hit Canfield and her horse just after Falk backed away.  Canfield and the horse went up onto the hood of the truck.  Canfield's back and shoulders hit the windshield and her head struck the roof.  Canfield was then launched into the air and came down on her head, shoulder, and neck.  There was no evidence appellant tried to brake before hitting Canfield or that the truck slid into her and her horse; however, he

did turn toward the Service Center exit while, or immediately after, striking her with the truck.  Witnesses also testified that there was enough room in the Service Center lot that appellant could have avoided hitting Canfield.

After striking Canfield and her horse, appellant stopped the truck and Falk ran to the passenger side and got in.  Jeffcoat testified that they then "took off as fast as the truck could go."  Jay Miller, a fire hydrant technician with the Service Center, saw appellant take the truck and managed to follow it as it left the Service Center lot.  Miller called 9-1-1 and remained on the phone during the chase.  Miller testified that at one point the truck's passenger sat up in the windowsill of the truck and pointed a rifle at him.  Miller further testified that the passenger fired at him, but his vehicle was not hit.  Miller continued to chase them on and off the highway until the truck pulled into a parking lot and the inmates got out and ran into some nearby woods.  Miller parked his vehicle to block the road and then chased the inmates on foot to see if they were going to come out on the other side of a fence at the bank next door.  The police arrived at this time and Miller directed them towards the bank.

Walker County Deputy Brian Smallwood arrived at the bank to see appellant and Falk run to a red truck that was in the drive-thru lane.  Falk entered through the driver's door and shoved the female driver over.  Appellant, who now had the rifle, jumped into the bed of the truck.  Huntsville Police Sergeant Ron Cleere also observed this and got out of his vehicle with his gun drawn, but the inmates drove off before he could attempt

to stop them.  Cleere fired at the truck's tires seven times hitting one of them, but the truck did not stop.  Both Smallwood and Cleere pursued the red truck.

Falk drove the truck onto the interstate but exited after only 3/4 of a mile.  He pulled onto a grassy field next to some woods because the right front tire was shredded.  Smallwood pulled his car into a ditch 50 yards away from the red truck.  Appellant stood up in the bed of the truck and pointed the rifle at Smallwood.  Smallwood heard a shot as he opened his door.  Smallwood fired at appellant as appellant ran into the woods.  Cleere arrived and fired at appellant as well.  Falk got out of the truck and also ran for the woods.  Cleere saw appellant again on the edge of the woods, using the base of a tree to steady the rifle.  Cleere went to retrieve his own rifle from his car, but when he returned he did not see appellant.  Appellant then stood up and Cleere fired at him with his rifle, but appellant got away.  When other officers arrived, they set up a perimeter around the wooded area.  The owner of the truck was unharmed.

Huntsville Police Lieutenant Daryl Slaven apprehended Falk behind the Walmart on the other side of the wooded area.  When Falk heard the police car, he stopped and put his hands in the air.  The authorities searched for appellant in the wooded area on horseback and using dogs.  The rifle was found lying in the woods with three rounds still in it.  After approximately two hours, appellant's boots and some clothing were found hidden in the dirt of a creek bed.  Appellant was eventually discovered hiding in a tree wearing only his underwear.

Dallas County Medical Examiner Tracy Dyer testified that Canfield died from a significant impact that caused an unsurvivable hinge fracture to her skull which went from ear to ear. Viewing photos of the damage to truck, Dyer opined that it would have taken a "significant amount of velocity" for Canfield's body to have caused the dent at top of the windshield. She noted that Canfield also sustained a depressed skull fracture as well as external injuries including bruising and lacerations to her head, hands, arms, trunk, and legs. Veterinarian Richard Posey testified that Canfield's horse had extensive injuries from a bullet wound, plus trauma to its left hip, scrapes on its hips and hock, and a swollen joint on its front leg from the impact. The horse had to be put down.

In appellant's first point of error, he complains that the trial court erred in overruling his motion for a directed verdict on the grounds that the evidence was legally insufficient to show that Canfield's death occurred while he was escaping. Specifically, he asserts that Texas Penal Code §19.03(a)(4) incorporates the offense of escape, pursuant to Texas Penal Code §38.06, and that case law dictates the offense of escape was complete when he went through the prison fence onto city property. *See Lawhorn v. State*, 898 S.W.2d 886, 890 (Tex. Crim. App. 1995); *Fitzgerald v. State*, 782 S.W.2d 876, 881 (Tex. Crim. App. 1990).[2] For the reasons below, we find that the offense of escape found in Texas Penal Code §38.06 is not incorporated into the capital-murder statute.

The provisions of the Penal Code must be "construed according to the fair import

_____

[2] *See* discussion of *Lawhorn* and *Fitzgerald* in point of error six, *infra.*

of their terms, to promote justice and effect the objectives of the code." TEX. PENAL CODE §1.05(a). When attempting to discern the collective legislative intent or purpose of a statute, we focus on the literal text of the statute and attempt to discern a fair and objective meaning of the statute's text at the time it was enacted. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). We focus on the text because it is the only definitive evidence of the legislators' intent and the Legislature is constitutionally entitled to expect the judiciary to faithfully follow the specific text that was adopted. *Id*. Therefore, if the meaning of the statute, when read using the canons of construction, should have been plain to the legislators who passed it, then we give effect to that plain meaning. *Id*.

Upon examining the language of the capital-murder statute, it is apparent that when the statute requires proof of a predicate offense, it does so explicitly by using language that the murder was done "in the course of committing or attempting to commit" a specific offense. *See* TEX. PENAL CODE §19.03(a)(2)(listing "kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat under Section 22.07(a)(1), (3), (4), (5), or (6)" as offenses). All of these predicate offenses are legislatively defined. *See* TEX. PENAL CODE §§20.03 (kidnapping), 30.02 (burglary), 29.02 (robbery), 22.021 (aggravated sexual assault), 28.02 (arson), 36.06 (obstruction or retaliation), 22.07 (terroristic threat). The Legislature could have included the offense of "escape" in subsection (a)(2), or could have used the language "in the

course of committing or attempting to commit," in subsection (a)(4); however, it did neither.

Subsection (a)(4) does not speak of "escape" as an offense that must be committed or attempted, but rather as a factual circumstance to be proven, similar to circumstances described in other subsections of the capital-murder statute. *Compare* TEX. PENAL CODE §19.03(a)(4) (stating that the State must prove the murder was committed "while escaping . . . from a penal institution") *with* TEX. PENAL CODE §19.03(a)(5)(A) (indicating that the State must prove the murder was committed "while incarcerated in a penal institution" against one "who is employed in the operation of the penal institution").

As evidenced by subsection (a)(2), the Legislature clearly knew how to specify that commission of the offense of escape was a predicate offense for capital murder. The Legislature's decision not to do so shows that they intended an application of the common-sense definition of "escaping" rather than the statutory definition of the offense of "escape." The phrase "while escaping" implies that the Legislature considered escape to be a process and desired to punish more severely any murder committed during that process. We read words and phrases in context and construe them according to the rules of grammar and common usage. TEX. GOV'T. CODE §311.011(a). According to the rules of grammar and common usage, the process of escaping is not complete until the inmate "get[s] away" or is able to "break away, get free, or get clear." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 774.

Applying the common-sense definition of "escape," we hold that the evidence is sufficient to show that appellant killed Canfield while escaping from the Wynne Unit. The facts show that Canfield was the "high rider" – a guard who patrolled just outside the prison fence. It would have been obvious to the inmates in the squads that, in order to escape or "get away," they would need to get past the high rider. While appellant was making his escape with Falk, Canfield was attempting to prevent it. In the course of their escape, appellant killed Canfield. Although there is a point at which the escape is concluded under subsection (a)(4), because appellant murdered Canfield while he was in the literal process of escaping, we need not decide that point in this case.

The trial judge did not err in overruling appellant's motion for a directed verdict. Point of error one is overruled.

In his second point of error, appellant contends that the evidence is legally insufficient to show that he intentionally or knowingly caused Canfield's death. In reviewing the legal sufficiency of appellant's intent to cause death, we note that capital murder is a result-of-conduct offense. *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008). A person acts intentionally, or with intent, with respect to a result of conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE §6.02(a). A person acts knowingly, or with knowledge, with respect to a result of his conduct, when he is aware that his conduct is reasonably certain to cause the result. TEX. PENAL CODE §6.02(b). An accused's intent can be inferred from his acts, words, and

conduct. *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. 1982).

Appellant argues that he neither had a "conscious objective or desire" to cause Canfield's death nor was he "aware that his conduct was reasonably certain" to cause her death when the truck he was driving hit her horse. First, appellant contends that the fact that the horse was not significantly harmed by the truck shows that he did not intend to kill Canfield. He notes that the veterinarian testified that the horse was put down because of the gunshot wound and not the truck impact, and asserts that the veterinarian testified that the horse was not even harmed by the collision. However, the veterinarian, Dr. Posey, did testify that the horse was harmed by the truck when he noted bruising or trauma to the horse's left hip and scrapes to its hips and hock, along with a swollen joint on its front left leg. Posey also testified that it was not unusual for a horse to be able to walk and have no broken bones after impact by a vehicle.

Next, appellant argues that the horse was turning or circling when he hit it, and because the damage to the truck was on the right passenger side, he must have been turning away from the horse when he hit it with the truck. He reasons that this evidence proves that he attempted to miss the horse because, if he wanted to kill Canfield, he would not have turned the truck at all. He also notes that he would have killed Falk, if Falk had not backed away. He contends that the evidence shows that Canfield's death was clearly just a tragic accident.

Viewed in the light most favorable to the verdict, the evidence shows that

appellant and Falk worked together to effectuate their escape. Canfield was the only obstacle to both men getting away. Witnesses testified that once appellant began to drive the truck, the engine was "wide open," "revved up at high rpms," and "floorboarded," and it was headed straight toward Canfield. Sergeant John Tucker, a Department of Public Safety ("DPS") accident reconstructionist, observed tire marks "caused by a vehicle accelerating into a turn." There was no evidence of braking or swerving near the point of impact. Further, the evidence showed that there was a clear space of over 40 feet on either side of Canfield into which appellant could have moved to avoid colliding with her. When appellant did turn, it was in the direction of the exit. Based upon this evidence, the jury could reasonably infer that, even if Canfield's horse was turning or circling, appellant intentionally or knowingly caused Canfield's death. Point of error two is overruled.

*Punishment Phase*

In point of error three, appellant challenges the sufficiency of the evidence regarding future dangerousness. *See* Article 37.071 § 2(b)(1). As with the guilt phase, in reviewing the sufficiency of the future-dangerousness evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed beyond a reasonable doubt that there was a probability that the defendant would commit criminal acts of violence. *Williams v. State,* 273 S.W.3d 200, 213 (Tex. Crim. App. 2008); *Banda v. State*, 890 S.W.2d 42, 50 (Tex. Crim. App. 1994). A jury is permitted to consider a variety of factors when determining whether a defendant

will pose a continuing threat to society. *See Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

In its determination of the special issues, the jury is entitled to consider all of the evidence presented at the guilt phase of the trial, in addition to the evidence presented at the punishment phase. *Banda*, 890 S.W.2d at 51; *Valdez v. State*, 776 S.W.2d 162, 166-67 (Tex. Crim. App. 1989). In some instances, the circumstances of the offense and the events surrounding it may alone be sufficient to sustain a "yes" answer to the future-dangerousness special issue. *Banda,* 890 S.W.2d at 51; *see also Hayes v. State,* 85 S.W.3d 809, 814 (Tex. Crim. App. 2002). The jury is the exclusive judge of the credibility of witnesses and the weight to be given their testimony. *Colella v. State*, 915 S.W.2d 834, 843-44 (Tex. Crim. App. 1995).

The evidence in the instant case revealed that appellant and Falk worked as a team to escape from the Wynne Unit. While Falk drew fire from the guards, appellant obtained a truck and then used it to incapacitate Canfield – the last guard impeding the duo's get away. Appellant and Falk then led the authorities on a car chase, eventually abandoning the city truck. They then kidnapped a woman and took her vehicle. When that vehicle was no longer driveable, appellant engaged in a short gunfight with officers before fleeing on foot and hiding in the woods. This evidence alone supports a finding of future dangerousness. However, further evidence presented at the punishment phase also supports this finding.

At the time he killed Canfield, appellant was serving a 50-year sentence for attempted capital murder, a 40-year sentence for another attempted capital murder, a 10-year sentence for aggravated assault, and a 10-year sentence for failure to appear. The victims of the attempted capital murders and the aggravated assault were peace officers.

In addition to appellant's prior offenses, the State offered evidence showing that appellant lacked remorse for the instant offense and felt that his conduct was not only reasonable but courageous. Two weeks after Canfield's death, appellant sent a letter to his older brother, John, in which he discussed the instant offense:

> Well I'm sure by now that you have heard the news about my escape from the Wynne farm. I wasn't gone for more than a few hours until I was recaptured. There was a shootout with the police, a couple of high speed chaces [sic], and a death. You will never know the resolve, the desperate courage it took for me to wrestle an armed guard off his horse – and take his gun away frome [sic] him, while having three other armed guards on horses shooting at you. One of those three lost there [sic] life, and as a result I now have to face the death penalty becaus [sic] of it.

> I do not expect you to fully understand my reasonings – you would have to walk a mile in my shoes to understand what drove me to make such a decision. I exhausted every reasonable means of appealing my case – through the State – as well as through my own family, you encluded [sic]. I begged you to speak to Robert Looper & Jimmy Warnell [the officers he was convicted of attempting to shoot]. For "four" years I have been reaching out to my family to help – It makes no difference now . . . This is not something that happen [sic] overnight John . . . surely in your heart you knew it would someday come down to this – what other choice did I have? 25 years is a long-long time to do brother. I barely had 12 done and the next thirteen were overwhelming. I did only what was to be reasonably expected of me to do – win, loose [sic] or draw, I tried for freedom. I lost.

* * *

I am a real outlaw brother.  My prison record speaks for its self [sic].
Now I'm gona [sic] die an outlaws [sic] death.

The State also called Stephen Rogers, employed by the TDCJ State Classification Office, to testify about the classification levels in the Texas prison system and how an inmate's level is determined.  He described the layout, security measures, and privileges with regard to general population and administrative segregation.  He testified that a person receiving a sentence of life without parole would be assigned to the G-3 general population classification indefinitely.  However, he noted that due to appellant's escape risk and the fact that he killed a guard, appellant would most likely be assigned to administrative segregation and could remain there for the duration of his incarceration.  Rogers did note that inmates have committed acts of violence and escaped from administrative segregation.  Texas Special Prosecution Unit Senior Criminal Investigator A.P. Merillat also testified about the level of security on death row and the newly defined "High Security" classification.  He noted that there were opportunities for inmates to commit violence in all classification levels, including on death row, against fellow inmates, guards, chaplains, investigators, visitors, or medical personnel.

Appellant presented the facts of his previous offenses of attempted capital murder through the testimony of witnesses.  On August 15, 1994, police were called to appellant's mother's home regarding a domestic disturbance with shots fired.  When Deputy R.D. McCommas arrived at the residence, he saw two or three people outside the home.  As he approached, appellant got into a red truck and drove off.  The people at the

home confirmed that appellant was the one "causing problems." After determining that everyone at the house was unharmed, McCommas pursued appellant. McCommas was in a marked car with the lights and siren activated. Two other county sheriff's cars and a DPS trooper became involved in the high-speed chase. Appellant was going 60 to 70 mph on a two-lane country road, and he drove through some yards adjacent to homes. McCommas saw appellant waving a gun through the back window of the truck. The DPS trooper then took the lead in the chase and radioed that "shots had been fired." McCommas could see the trooper returning fire.

Appellant eventually turned off the road into a maize field and positioned his truck so that it to faced back toward the road. Appellant got out of the truck holding a gun to his head. A stand-off ensued that lasted several hours. Other officers, sharp shooters, and police negotiators came to the scene, but, per policy, the officers were ordered not to return fire if appellant fired his weapon.

Deputy Jimmy Warnell, a Collin County Sheriff's negotiator, attempted to get appellant to surrender and turn over his gun. Warnell spoke with appellant while behind a bulletproof shield. Appellant threatened to kill Warnell, and did fire a shot in close proximity to him. Appellant fired other shots, one coming close to McCommas. At one point, appellant even put the gun into his own mouth. Appellant was eventually arrested, and no one was harmed.

Following his arrest on August 15, 1994, appellant was released on bond which

was posted by his uncle. However, appellant fled Texas and failed to make his court appearance. Appellant was arrested in Kansas in 1997 and returned to Texas to face charges for aggravated assault, two attempted capital murders, and failure to appear.

At punishment, Appellant also presented evidence regarding his childhood and family. Appellant's brother, John, testified that appellant was the fourth of five children, having an older sister, two older brothers, and a younger sister. When appellant was fairly young, their parents got divorced. The children lived with their mother and moved several times. They did not get to see their father very often due to animosity between the parents.

Tami, the oldest, joined the Marines when she finished high school. Joey, the second oldest, began having problems with drugs when he was in his teens and dropped out of school in the tenth grade. After he quit school, Joey lived "in ditches or in the woods." When Joey was 18 or 19, he died in a fire. According to John, appellant was a "happy go lucky kid" prior to Joey's death, but John noticed a difference afterward.

When he was eleven, appellant attempted suicide by shooting himself. When he was in his early teens, he began using drugs. John testified that appellant "got out of control with the drugs, and my mom shipped him off to dad." Appellant did not finish high school. John was aware that appellant was convicted of theft in Dallas County in 1988, and was sentenced to shock probation, and attended boot camp.

John moved to Nevada with his wife in 1990 or 1991 and began working on a

ranch there. Appellant also moved to Nevada and lived with John while working in a casino as a cook. John noted that appellant still had a problem with drugs and alcohol, and served jail time in Nevada. Appellant committed the attempted capital-murder offense within 18 months of returning to Texas. John testified that he never discussed the 1994 incident with appellant, but his mother told him that appellant was threatening suicide that day and had not threatened her life.

John further testified about appellant's abilities as an artist. TDCJ Captain John Bolton testified that appellant worked for four or five years on the "paint squad" at the Polunsky Unit. He confirmed that appellant was a talented artist and that he did some murals around the prison. He stated that appellant was one of the best painters ever to work for him.

Appellant's father, Joe Martin, testified that he and appellant's mother never got appellant the help he needed to deal with his alcohol and drug problems. Joe mistakenly assumed that the hospital would provide appellant with the help he needed following his suicide attempt.

Eric Albritton, the appellate counsel for appellant's 1994 convictions, testified that he believed appellant's trial counsel was ineffective because he did not raise evidence regarding appellant's mental condition. Albritton believes that appellant was attempting to commit suicide by provoking the officers that day in the maize field. Albritton admitted, however, that he lost this argument on both appeal and petition for discretionary

review.

Appellant presented his own prison-classification expert, Frank Aubuchon. Aubuchon had been the former administrator of unit classification for TDCJ. Aubuchon detailed the type of restrictions and security present when an inmate is assigned to administrative segregation. He described the living environment, the restraints used to transport an inmate assigned to administrative segregation, and the fact that the inmate would remain handcuffed even during medical visits. Aubuchon opined that appellant would remain in administrative segregation for the rest of his life if he received a sentence of life without parole.

Finally, Dr. Roger Saunders, a forensic clinical psychologist, testified that appellant has major or "severe" depressive disorder that was first evidenced by appellant's suicide attempt at the age of eleven. Saunders noted that appellant's medical records also showed that he was diagnosed with bi-polar disorder, mood disorder, substance-abuse disorder, and dependent personality features. He stated that the depressive disorder brought on appellant's alcohol and drug problems and probably caused appellant to quit school. He also testified that a severe depressive disorder can cause thoughts of doing things that are irrational and irresponsible. However, Saunders also testified that this depressive disorder is a very treatable illness and that appellant was receiving treatment while incarcerated. He also confirmed that there was no evidence in appellant's records that he was experiencing a depressive episode at the time of the

instant capital murder.

Appellant argues that the future-dangerousness evidence should be outweighed by the mitigating evidence he presented, plus the facts that Canfield's death was actually more of a vehicular accident than an intentional murder, that he had not actually harmed anyone during his previous offenses, and that he had a good disciplinary record while incarcerated. However, while this Court can review the objective evidence of future dangerousness, we do not review the jury's normative decision on mitigation. *Colella*, 915 S.W.2d at 845. Nor do we weigh the aggravating versus mitigating factors. *McFarland v. State*, 928 S.W.2d 482, 497-98 (Tex. Crim. App. 1996). Therefore, we defer to the jury's conclusion that the mitigating evidence was not sufficient to warrant a sentence of life imprisonment.

The circumstances of the instant offense suggest that appellant's acts were calculated and deliberate. Given these facts, plus appellant's written admission that he is ready and willing to use violence to get out of a lengthy prison sentence and the nature of his previous offenses, we conclude that a rational jury could find that there is a probability that appellant will commit criminal acts of violence that constitute a continuing threat to society. Point of error three is overruled.

### JUROR MISCONDUCT

In points of error four, five and ten, appellant focuses on one specific act of alleged juror misconduct – juror Carrie Doak's negative response to question 79 of the

juror questionnaire regarding whether she, a family member, or friend ever worked for the prison system, when, in fact, Doak's husband had worked as a guard and been stabbed by an inmate. Specifically, in point of error four, appellant contends that Doak withheld material information that denied appellant "his right to intelligently exercise his challenges resulting in him being denied a fair trial." In point of error five, appellant contends that the trial court abused its discretion by denying his motion for new trial because Doak's alleged "material misrepresentation" on the juror questionnaire "resulted in the appellant being denied a trial [before] an impartial jury." In point of error ten, he argues that the trial court erred in denying his motion for new trial because Doak discussed this previously unrevealed information with the rest of the jury, thereby denying him a fair trial before an impartial jury.

A review of the record shows that, while filling out the juror questionnaire, Doak answered the following question in the negative:

79.     Have you, a family member, or friend ever been employed, served in, or been a member of, any local, state, federal, or other law enforcement agency, including, but not limited to, any police department, any Sheriff's Office, office of any District or County Attorney, Attorney General's office, or any prison system?

During individual voir dire, appellant did not ask Doak whether she knew anyone who had ever worked for the prison system. Doak was accepted as a member of the jury. We note that two other prospective jurors with known connections to the Texas prison system were accepted as jurors. Juror Jerel Thornhill had formerly worked at the Limestone

County Detention Center. Counsel did not ask him whether he ever encountered violence during his employment. Juror Brenda Green indicated that, while she and her former husband were married, he had been a Texas Department of Corrections ("TDC")[3] prison guard for 20 years, including "working the death chamber." Counsel did not question her regarding whether her former husband experienced violence on the job. After the trial concluded, it was learned that Doak's husband had been employed in the Texas prison system.

Appellant filed a Motion for New Trial alleging in one of his grounds that Doak had "withheld material information" at voir dire that denied him an impartial jury. Appellant relied upon the affidavit of juror Lori Ann Jenkins, in which she claimed that the jury considered outside evidence during punishment deliberations.[4] Specifically, Jenkins stated:

---

[3] TDC was later renamed the Texas Department of Criminal Justice.

[4] Texas Rule of Evidence Rule 606(b) states that a juror may not testify or make an affidavit about any matter or statement occurring during deliberations or the effects of anything on any juror's mind as influencing the verdict with two exceptions: (1) "whether any outside influence was improperly brought to bear upon any juror," or (2) "to rebut a claim that the juror was not qualified to serve." In points of error four, five, nine, and ten, appellant relies upon an affidavit and testimony obtained during the hearing on the Motion for New Trial that implicate Rule 606(b). Neither party objected to the use of this evidence.

We express no opinion as to whether the admittance of this evidence was proper; however, as no objections were lodged, the testimony and affidavits of the jurors are available for our consideration in determining whether reversible error occurred. *See Salazar v. State*, 38 S.W.3d 141, 147 (Tex. Crim. App. 2001); *see also McQuarrie v. State*, No. PD-0803-11, slip op. at 9-18, ___ S.W.3d ___ (Tex. Crim. App. Oct. 10, 2012).

Mrs. Doak told the jury about an incident involving her husband. She said that her husband had worked in the Texas prison system and had been stabbed by an inmate while employed there. As I recall, she said that her husband had worked in Administrative Segregation when the stabbing occurred.

The trial court held an evidentiary hearing on the Motion for New Trial. Nine of the twelve jurors testified at the hearing as follows:

Monica Cooke:      Cooke did not hear Doak have any discussions about a stabbing incident that involved her husband while he worked in TDC. She was not aware of any discussions by any members of the jury about any acts of violence that took place in TDC except those that were introduced during the trial.

Jerel Thornhill:   Thornhill did not hear any discussions about anyone having any personal experience regarding acts of violence in administrative segregation or in TDC in general. He specifically testified that he did not remember any juror discussing his or her knowledge of a family member or friend being stabbed or subjected to any type of violence while employed by TDC.

Carrie Doak:       Doak testified that her husband had worked in administrative segregation at the Ferguson Unit. He was stabbed by an inmate once while on the job. He worked for TDC seventeen years ago, for a period of only eighteen months. He did not think that the incident was a "big deal." She did not discuss this at all during deliberations nor did she hear anyone else discuss it. She noted that the only time that it came up was "three of us ladies were talking about our experiences and what our husbands had done," when they were just getting to know each other during the trial. It was not a long or detailed conversation. The other ladies were "Connie" and "Peggy." Jenkins was not part of the conversation, but if Jenkins was around them where she could hear, it is possible that Jenkins overheard it. Doak testified that the fact that her husband had been subjected to an assault in TDC had absolutely no impact on her deliberations.

Regarding the juror questionnaire, Doak testified that her incorrect response was an accident – she did not mean to answer the question

incorrectly.  When filling out the questionnaire, she was in a rush to get to a doctor's appointment regarding her first grandchild.  She did not even know that she answered it incorrectly until she was contacted after the trial was over. The questionnaire was 23 pages and question 79 was long –  she is sure that she read the first three lines and did not see the last three or four words of the paragraph.  Also, the question did not mention TDC.  She was shocked that she was selected for the jury and noted that had she been verbally asked during voir dire, she would have told them her husband had worked in the prison system.  She stated that she lived in a small town and the incident was public knowledge.  Doak knew half of the jury "very well," although she did not know Jenkins.  She did note that she and Jenkins had friends in common.  Also, when she realized that some of the other jurors had experience with the prison system – some up to 30 years and with death row – she thought that it must not matter.

| | |
|---|---|
| Brenda Green: | Green testified that her former husband worked for TDC and she had discussed that with counsel during voir dire.  During lunch one day, Doak mentioned that her husband had once worked at TDC and had been stabbed while working there.  The only other person that may have been privy to the conversation other than herself and Doak was "whoever was sitting besides us," but she could not remember who that was.  Green testified that the incident was not discussed during deliberations by anyone, nor does she remember anyone discussing it at any other time. |
| Pegene Parker: | Parker never heard anyone discuss any specific instances involving acts of violence regarding their family members or themselves at TDC. |
| Matthew Winn: | Winn never had any knowledge about Doak's husband being stabbed while working at TDC. |
| Thomas Davis: | Davis testified that he has known Mr. and Mrs. Doak for a long time.  He knew that Mr. Doak had worked for TDC and had at one time been the victim of a stabbing.  He did not hear anyone discussing this incident during deliberations.  He believes Doak mentioned that her husband used to work for TDC when the jurors were casually getting to know one another in the first couple of days the jury was at the |

courthouse. He does not recall ever hearing Doak mention that her husband had been stabbed. He testified that even if someone had brought up the incident during deliberations it would not have made a difference because they had the evidence in the case – "paperwork out in front of us that had stated what all goes on in [prison]."

James Nash: Although Nash was the foreperson of the jury, neither appellant nor the State questioned him regarding Doak or her husband.

Lori Jenkins: Jenkins stated that Doak mentioned her husband and the stabbing incident shortly after they were convened as a jury. She stated that Doak mentioned it over and over and some of the jurors talked about it a lot. She believed that this also occurred during jury deliberations. However, she also testified that this information had no influence on her own vote and she could not say how it influenced others.

In point of error four, appellant contends that Doak purposefully withheld material information that her husband was employed as a prison guard and was stabbed by an inmate. Appellant argues that because Doak withheld this material information, he was denied the opportunity to exercise challenges intelligently, thus hampering his selection of a disinterested and impartial jury.

We note that both the Sixth Amendment and Article I, Section 10 of the Texas Constitution provide criminal defendants the right to a trial by an impartial jury. *Uranga v. State*, 330 S.W.3d 301, 304 (Tex. Crim. App. 2010). The protection under the Texas constitution is no greater than that offered by the federal constitution. *Jones v. State*, 982 S.W.2d 386, 391 (Tex. Crim. App. 1998).

This Court has found that "essential to the Sixth Amendment guarantees of the assistance of counsel and trial before an impartial jury is the right to question specific

veniremembers in order to intelligently exercise peremptory challenges and challenges for cause." *Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004)(citation omitted). As well, "where a juror withholds material information during the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury." *Id.* However, it must be established that the juror withheld the information during voir dire and that the information was withheld despite the defendant's exercise of due diligence. *Id.* at 355-56; *Jones v. State*, 596 S.W.2d 134, 137 (Tex. Crim. App. 1980), *overruled on other grounds, Sneed v. State,* 670 S.W.2d 262, 266 (Tex. Crim. App. 1984).

In *Gonzales v. State*, 3 S.W.3d 915, 916 (Tex. Crim. App. 1999), we specifically addressed, for the first time, "the extent to which counsel may rely on information provided in written juror questionnaires." Prior to *Gonzales*, our cases addressing juror non-disclosure were limited to the verbal-questioning portion of the voir dire process. *See*, *e.g.*, *Franklin*, 138 S.W.3d at 352; *Armstrong v. State,* 897 S.W.2d 361, 362 (Tex. Crim. App. 1995); *Jones*, 596 S.W.2d at 136. In *Gonzales*, we considered a line of cases holding that purportedly material information is not deemed to have been "withheld" when defense counsel fails to ask sufficient questions during the voir dire process. *Gonzales*, 3 S.W.3d at 916. When considering counsel's reliance on particular responses to a juror questionnaire, we held that "'diligent counsel' will not rely on written questionnaires to supply any information that counsel deems material." *Id.* at 917.

As in *Gonzales*, defense counsel in this case did not ask any oral questions in an effort to verify whether prospective jurors had any connection to the prison system. Further, even when a prospective juror answered question 79 in the affirmative, counsel did not inquire during voir dire whether that person, her relative, or her friend experienced violence while employed with the prison system. Because counsel did not follow up on the written questionnaire with more specific verbal questioning, it appears that counsel did not consider this information to be "material" to the case. We further note that the information "withheld" by Doak does not rise to the level of information that we have previously held to be material. *See, e.g., Franklin*, 138 S.W.3d 351 (after stating that she knew none of the parties involved in trial, juror informed court that she was the assistant leader of victim's Girl Scout troop and that her own daughter was also in the victim's troop); *Von January v. State*, 576 S.W.2d 43 (Tex. Crim. App. 1978)(juror failed to disclose that he knew the deceased victim's family although asked directly during voir dire); *Salazar v. State*, 562 S.W.2d 480 (Tex. Crim. App. 1978)(in case where defendant was on trial for exposing genitals to a young girl, juror failed to disclose that he had been prosecution witness in criminal proceeding where he was eyewitness to sexual assault of own daughter). As Doak did not withhold material information, point of error four is overruled.

In point of error five, appellant asserts that the trial court abused its discretion in denying his motion for new trial because Doak withheld material information that denied

him a trial before an impartial jury.[5]  A trial court's ruling denying a defendant's motion

for new trial is reviewed under an abuse of discretion standard.  *Salazar v. State*, 38

S.W.3d 141, 148 (Tex. Crim. App. 2001).  We do not substitute our judgment for that of

the trial court, but simply determine whether the trial court's analysis was arbitrary or

unreasonable.  *Id.*; *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995).  The trial

court is the sole judge of the credibility of the testifying jurors.  *Salazar*, 38 S.W.3d at

148.  "Where there is conflicting evidence on an issue of fact as to jury misconduct, the

trial judge determines the issue and there is no abuse of discretion in overruling the

motion for new trial."  *Thomas v. State*, 699 S.W.2d 845, 854 (Tex. Crim. App. 1985).

As discussed in point of error four, the information at issue was not material and

appellant did not use due diligence to elicit it.  *See Franklin*, 138 S.W.3d at 355-56.

Therefore, the trial court did not err in overruling the motion for new trial.  However,

even assuming *arguendo* that appellant could show error, he cannot show that he was

harmed.

> We do not hold that an appellant is entitled to a reversal of his conviction in
> any case in which he discovers that a juror withheld information during voir
> dire.  Where the information is not material and the juror can state that it
> will not affect his deliberation or verdict, an appellant may be unable to
> show harm.

*Gonzales*, 3 S.W.3d at 912 n.2, *quoting Salazar v. State*, 562 S.W.2d 480, 482 n.5 (Tex.

---

[5]  For the first time on appeal, appellant claims that Doak also withheld information regarding whether any member of her family had ever been the victim of a crime (Question 66 on the juror questionnaire) because a stabbing is a criminal offense.  Appellant has not preserved this claim for appellate review.  TEX. R. APP. P. 33.1(a).

Crim. App. 1987).  Non-constitutional error will be disregarded if it did not affect the appellant's substantial rights.  TEX. R. APP. P. 44.2(b).[6]

The record here supports a credibility determination that Doak remained an impartial juror throughout appellant's trial.  Doak specifically testified that she was "absolutely" not influenced in her deliberations by the stabbing incident involving her husband.  Notably, the incident occurred over seventeen years before and, at that time, Doak's husband did not consider the incident to be a "big deal."  Because appellant cannot show Doak's verdict was affected by her husband's stabbing incident when he was a guard, point of error five is overruled.[7]

In appellant's tenth point of error, he argues that the trial court erred in overruling his motion for new trial because Doak discussed the stabbing incident with other jurors, thereby denying him a fair trial before an impartial jury.  He specifically points to the testimony of Doak and jurors Green, Davis, and Jenkins.

The record shows that Doak's presence on the jury did not unduly influence the other jurors.  Only jurors Green, Davis, and Jenkins testified that they knew or heard any

---

[6]  *Cf. Franklin*, 138 S.W.3d at 354-58 (harm will be reviewed under Texas Rule of Appellate Procedure 44.2(a) for constitutional error where information withheld is material and counsel was diligent in trying to elicit the information).

[7]  At the end of his argument, appellant briefly asserts that Doak was guilty of "corrupt conduct" by withholding material information on her questionnaire and cites to Texas Rule of Appellate Procedure 21.3(d).  Nowhere in his argument does appellant address how a juror's act of non-disclosure could amount to "corrupt conduct" within the meaning of Rule 21.3(d).  Without more, we will not evaluate this line of appellant's argument.  *See* TEX. R. APP. P. 38.1(I).

information regarding Doak's husband. Green and Davis testified that the incident involving Doak's husband was not discussed during jury deliberations and this was confirmed by every other juror questioned at the motion for new trial hearing with the exception of Jenkins. However, even Jenkins could not say that her knowledge of the stabbing incident influenced her deliberations or the deliberations of the other jurors.

Because appellant cannot show that Doak's presence as a juror denied him his right to an impartial jury, the trial court did not abuse its discretion in denying appellant's motion for a new trial. *See Salazar*, 38 S.W.3d at 148. Point of error ten is overruled.

JURY CHARGE: GUILT PHASE

In point of error six, appellant asserts that the trial court erred in denying his requested jury instruction regarding "escape." Specifically, appellant requested that the jury be instructed that escape is not a continuing offense, that an escape is complete when the defendant "moves beyond the bounds of his confinement without authority," and that if the jury had a reasonable doubt that the "escape" was completed before he hit Canfield with the truck, then it must acquit appellant of capital murder.

Article 36.14 requires a judge to deliver to the jury "a written charge distinctly setting forth the law applicable to the case." Here, appellant asserts that the law clearly states that one completes the offense of escape when he crosses the property line of the prison in which he is confined. Appellant relies upon the holdings in *Lawhorn v. State*, 898 S.W.2d 886, 890 (Tex. Crim. App. 1995), and *Fitzgerald v. State*, 782 S.W.2d 876,

881 (Tex. Crim. App. 1990).

As we stated in point of error one, the State did not have to prove the statutory offense of "escape." *See* point of error one, *supra.*; TEX. PENAL CODE §19.03(a)(4). Therefore, instructing the jury on the offense of escape as it pertains to the offense of capital murder would have been error. Further, we note that appellant misconstrues both *Lawhorn* and *Fitzgerald*.

Appellant asserts that both *Fitzgerald* and *Lawhorn* hold that the offense of escape is completed once an inmate moves beyond the actual property line of the prison – in this case, the fence surrounding the vegetable fields. He relies on the following sentence in *Fitzgerald*: "Thus Appellant with his cohorts committed the felony offense of escape by moving beyond bounds of Beto II Unit without authority, and his offense was complete at that point." 782 S.W.2d at 879. However, our *Fitzgerald* holding is limited to the facts of that case. In *Fitzgerald*, the defendant and another inmate cut through a perimeter fence unnoticed sometime before they were discovered missing at 7:00 a.m. *Id.* at 877 n.3. In *Lawhorn*, the defendant escaped from a transport van. Officer Waddle, the guard in the van, attempted to chase him but soon lost sight of him. The defendant was later spotted by another officer and apprehended. 898 S.W.2d at 888. We held under those facts that the offense of escape was completed when the defendant left the "state of detention or restraint by a peace officer" – when the defendant "ran from the van, or at the very latest, when Waddle gave up the chase and returned to the van containing her other

prisoners." *Id*. at 890.

"Escape," for the purposes of section 38 of the Penal Code, is defined as an "unauthorized departure from custody." TEX. PENAL CODE §38.01(2). We have held that phrase to mean "the act of leaving a state of detention *or* restraint by a peace officer and once the act is done the escape is accomplished." *Lawhorn*, 898 S.W.2d at 890 (emphasis added). In *Fitzgerald*, no guard attempted to prevent the inmates from leaving the prison, and so their escape was complete when they left the grounds. *Fitzgerald* did not contemplate a situation in which the inmates were confronted by guards while leaving the unit. In *Lawhorn*, the escape was complete when the defendant got away from the guard in the van. Therefore, even assuming that these cases defining the offense of escape under section 38.01(2) have any applicability to appellant's case, they tend to show that appellant's escape was *not* complete at the time that he killed Canfield because he had not left the effective restraint of a peace officer.

The trial court did not err in refusing appellant's requested instruction as it would have been a misstatement of the law. Point of error six is overruled.

In points seven and eight, appellant contends that the trial court erred by failing to give a lesser-included offense instruction on escape and by not providing appellant's proposed instruction on the lesser-included offense of escape in the court's jury charge. In particular, he claims that escape is a lesser-included offense of capital murder under section 19.03(a)(4), that he could have just been convicted of escape, as he lacked the

required intent to commit murder, and that his instruction on the lesser-included offense of escape was proper.

In deciding whether a defendant is entitled to a lesser-included offense charge, we consider all of the evidence introduced at trial, regardless of its source. *Goodwin v. State*, 799 S.W.2d 719, 740 (Tex. Crim. App. 1990). This Court applies a two-pronged test in its review. *Rousseau v. State*, 855 S.W.2d 666, 672-75 (Tex. Crim. App. 1993); *Goodwin*, 799 S.W.2d at 740-41. Under the first prong, it must be shown that the lesser-included offense is included within the proof necessary to establish the offense charged. *Id*. The second prong then requires some evidence in the record that would have permitted a rational jury to find the defendant guilty of only the lesser-included offense. *Id*. When making the determination of whether an instruction on a lesser-included offense should have been given, the credibility of the evidence, whether it conflicts with other evidence or whether it is controverted, may not be considered. *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994).

As held above, the offense of escape is not a lesser-included offense of capital murder under section 19.03(a)(4) because the legislature was not using the term "escaping" to refer to the offense of escape; rather, they were using it in its common usage to describe a process. *See* point of error one, *supra*. Because the process of "escaping" is not an offense in and of itself, it is not within the proof necessary to establish the charged offense. Therefore, appellant does not meet the first prong of the

test. *Rousseau*, 855 S.W.2d at 672-75. Accordingly, the trial judge did not err in overruling appellant's objection that a lesser-included offense instruction should have been given. For the same reason, the trial judge also did not err in denying the appellant's proffered lesser-included offense instruction.[8] Points of error seven and eight are overruled.

## PUNISHMENT DELIBERATIONS

In point of error nine, appellant contends that the trial court committed reversible error by giving the jury a "coercive" instruction during punishment deliberations. Appellant argues this instruction denied him his right to trial by an impartial jury.

Article 37.071 §2(g)[9] compels the trial court to enter a life sentence if the jury is unable to answer any special issue. *Howard v. State*, 941 S.W.2d 102, 121 (Tex. Crim. App. 1996); *Montoya v. State*, 810 S.W.2d 160, 166 (Tex. Crim. App. 1989). However, the trial court is not bound to enter a life sentence after the first sign of juror impasse. *Howard*, 941 S.W.2d at 121. Rather, the court may do so if it determines, in its

---

[8] Appellant argues that escape must be a lesser-included offense of capital murder because the trial court included the statutory definition of escape in the charge. However, the statutory definition was not applicable to the capital-murder charge but to the lesser-included "murder in the course of another offense" charge that appellant also received. Appellant received the following lesser-included offense charges: murder in the course of the commission of another offense (TEX. PENAL CODE §19.02(b)(3)), aggravated assault (TEX. PENAL CODE §22.02(a)), manslaughter (TEX. PENAL CODE §19.04), and criminally negligent homicide (TEX. PENAL CODE §19.05).

[9] Formerly codified as Article 37.071 §2(e). *Howard* discusses the former codification of the article which is substantively the same.

discretion, that the jury has been kept together for such a time as to render it altogether improbable that it can agree. *Id.*; *see also* Article 36.31. When reviewing the trial court's discretion in this regard, this Court will consider the sheer length of the trial and amount of evidence presented to the jury. *Id.*; *Green v. State*, 840 S.W.2d 394, 407 (Tex. Crim. App. 1992).

The record shows that the evidence in this case took eleven days to present and involved 43 different witnesses and 122 admitted exhibits. Following closing arguments at punishment, the jury was sent to deliberate at 11:09 a.m. At 2:37 p.m., the jury sent out the charge with an attached note. The jury had answered "yes" to special issue one and the issue was signed by the foreperson on the verdict form. Special issue two was not answered, but the accompanying note stated: "On special issue #2 division is 9 no 3 yes. Guidance?"

Appellant argued that the jury had returned a final verdict because the jury was complying with the instruction on page four of the punishment charge which reads:

> If in considering Special Issue Number 2 the vote of the jurors is not unanimously "NO" or not at least ten (10) in favor of a "YES", then there shall be no answer for that Special Issue and the Jury Foreman should not sign his or her name to any answer form for that Special Issue Number 2.

Therefore, appellant asserted that the trial court must accept this as a final verdict and impose a life sentence. The trial court overruled the request and gave the jury the following instruction: "Please continue to follow the court's instructions as contained in the court's charge and continue to deliberate." Appellant objected that this instruction

was coercive and that the jurors who answered "yes" to the second special issue would be "bullied" by the other jurors.

At 3:24 p.m., the jury sent out another note regarding evidence of appellant's mental-health issues. Appellant again reurged his objection and stated that "we feel at this point that deliberations are now becoming coercive in nature to try to get the three hold outs to change their verdict in order to give a death sentence to [appellant]." The State responded that there was no evidence of coercion and that the jury had barely started deliberating as they had only been out for four hours and this was a long case. The trial court again overruled appellant's objection, noting that there was nothing before him that would lead him to the conclusion that "any bullying was going on."

At 4:40 p.m., the jury sent out a third note requesting to have testimony read back to them. Appellant again reurged his objection which the trial court again denied. The jury was recessed until the following afternoon at 1:00 p.m., so that the court reporter could locate the requested testimony and one of the jurors could attend a funeral.

When court reconvened the next afternoon, appellant again urged his objection to the jury's continued deliberation. The trial court overruled the objection. The jury returned its verdict at 3:15 p.m., having unanimously answered "yes" to the first special issue and "no" to the second special issue. The jury was polled, and each juror answered that this was his or her verdict.

Appellant also raised this issue in his Motion for New Trial.[10] Appellant attached an affidavit by juror Jenkins wherein she stated that she and the other two jurors who originally voted "yes" on the second special issue were harassed and bullied into changing their answers. She also stated that because the judge sent the case back to them to continue deliberating, she believed that the jury had to be unanimous on their answer before a verdict could be reached. She stated that she would not have changed her vote to "no" had she not believed this.

At the motion for new trial hearing, Nash, the jury's foreman, testified that when he sent the "9-3" note out, the jury had not yet taken a formal vote on the second special issue – everyone had just expressed their initial opinions. Nash was merely hoping that the trial court would tell them to take a break for the rest of the day because it had been a long trial and everyone was tired. No juror – not even Jenkins – testified to changing his or her vote because of the trial court's instruction to continue deliberations.[11]

The trial court is not bound to declare a mistrial at the first sign of jury impasse.

---

[10] We express no opinion as to whether the admittance of this evidence was proper; however, as no objections were lodged, the testimony and affidavits of the jurors are available for our consideration in determining whether reversible error occurred. *See Salazar v. State*, 38 S.W.3d 141, 147 (Tex. Crim. App. 2001); *see also McQuarrie v. State*, No. PD-0803-11, slip op. at 9-18, ___ S.W.3d ___ (Tex. Crim. App. Oct. 10, 2012).

[11] Appellant contends that several jurors testified at the motion for new trial hearing that they thought that they were "coerced" into believing that the verdict had to be "unanimous" or they "all had to agree" either 12-0 or 10-2, *because* the trial court instructed them to continue deliberating. However, we have reviewed the record and we do not find that any juror, including Jenkins, testified as such.

*Howard*, 941 S.W.2d at 121. Here, the jury first asked for guidance from the trial court when it had deliberated for a period of less than three-and-a-half hours. This trial involved a great deal of evidence: 43 witnesses and 122 exhibits, presented during eleven days of guilt and punishment testimony. The jury had obviously finished deliberating on the first special issue, but there was no indication that they were finished deliberating on the second special issue. The note did not say the jury was deadlocked but merely stated that their current "division" was "9 no 3 yes." The fact that the jury asked to see evidence and have testimony read back is further proof that they had not yet finished deliberating. The trial court did not err when it instructed the jury to continue deliberations. *See id*. at 121-22 (trial court did not err giving instruction to continue capital-punishment deliberations after jury note said they were "deadlocked" at 10-2 after eight hours of deliberating); *Green*, 840 S.W.2d at 407 (trial court did not err in instructing jury to continue deliberations and overruling motion to impose a life sentence after jury sent "deadlocked" note after six-and-a-half hours of deliberating). Point of error nine is overruled.

JURY CHARGE: PUNISHMENT PHASE

In point of error eleven, appellant asserts that he was harmed when the trial court overruled his objection that the punishment charge failed to instruct the jury that "probability" meant "more likely than not." In point of error twelve, he argues that he was harmed when the trial court overruled his objection that the charge failed to define

the phrase, "reduce moral blameworthiness." In point of error thirteen, appellant claims that he was harmed when the trial court overruled his objection that the charge failed to instruct the jury that "society" meant "society in prison," and not the free world.

We have previously decided these issues adversely to appellant. *See Saldano v. State*, 232 S.W.3d 77, 107 (Tex. Crim. App. 2007)("probability"); *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007)("probability," "moral blameworthiness"); *Hunter v. State*, 243 S.W.3d 664, 672 (Tex. Crim. App. 2007) ("society"); *Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003)("probability," "moral blameworthiness," "society"). Appellant provides no argument or authority to persuade us to revisit these issues. Points of error eleven, twelve, and thirteen are overruled.

CONSTITUTIONALITY OF THE TEXAS DEATH PENALTY

In points of error fourteen and fifteen, appellant argues that the Texas capital-sentencing scheme is unconstitutional because it fails to assign a burden of proof on the mitigation special issue and that the trial court erred in rejecting his request for an instruction assigning the burden to the State. We have previously rejected these arguments. *See Blue*, 125 S.W.3d at 500-01; *Druery*, 225 S.W.3d at 509. Further, this Court has held that the mitigation special issue is a defensive issue for which the State has no burden of proof. *Williams v. State*, 273 S.W.3d 200, 221-22 (Tex. Crim. App. 2008). Points of error fourteen and fifteen are overruled.

In point of error sixteen, appellant posits that the mitigation issue is

unconstitutional because meaningful appellate review of the sufficiency of the evidence is impossible.  We have previously rejected the claim that the issue violates the constitution because it deprives a defendant of "meaningful appellate review."  *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Prystash v. State*, 3 S.W.3d 522, 535-36 (Tex. Crim. App. 1999); *Green v. State*, 934 S.W.2d 92, 106-07 (Tex. Crim. App. 1996); *McFarland v. State*, 928 S.W.2d 482, 498-99 (Tex. Crim. App. 1996).  Point of error sixteen is overruled.

In appellant's seventeenth and eighteenth points of error, he argues that the "12-10 rule" of Article 37.071, which requires at least ten votes for the jury to return a negative answer to the first special issue and at least ten votes for the jury to return an affirmative answer to the second special issue, violates the Eighth Amendment to the United States Constitution.  We have repeatedly rejected identical claims.  *Russeau*, 171 S.W.3d at 886; *Lawton v. State*, 913 S.W.2d 542, 558-59 (Tex. Crim. App. 1995).  In point of error nineteen, appellant further posits that the "12-10 rule" violates his Sixth Amendment right to an impartial jury.  Appellant presents no argument or authority applying the Sixth Amendment to this provision of Article 37.071; therefore, this issue is inadequately briefed.  *See* TEX. R. APP. P. 38.1(I).  Points of error seventeen, eighteen, and nineteen are overruled.

Finally, in his twentieth point of error, appellant contends that Article 37.071 violates the Eighth Amendment because it fails to require that jurors be informed that a

single holdout juror on any special issue will result in an automatic life sentence.  We have previously decided this issue adversely to appellant.  *Russeau*, 171 S.W.3d at 886; *Shannon v. State*, 942 S.W.2d 591, 600-01 (Tex. Crim. App. 1996); *Lawton*, 913 S.W.2d at 559.  Point of error twenty is overruled.

We affirm the judgment of the trial court.

DELIVERED: October 31, 2012
DO NOT PUBLISH